# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| **JOHN DOE,** | **Civil Action No:** |
| *Plaintiff,* | |
| | **COMPLAINT** |
| -against- | |
| | **Jury Trial Demanded** |
| **INDIANA UNIVERSITY BLOOMING-TON, INDIANA UNIVERSITY BOARD OF TRUSTEES, KATHY ADAMS RIESTER, in her individual and official capacity, and LATOSHA WILLIAMS, in her individual and official capacity,** | |
| *Defendants.* | |

Plaintiff John Doe ("Plaintiff" or "Doe")[1], by his attorneys Nesenoff & Miltenberg, LLP, whose offices are located at 363 Seventh Avenue, 5th Floor, New York, New York 10001, and Delk McNally LLP, whose offices are located at 610 N. Rangeline Road, Carmel, IN 46033 as and for his Complaint, respectfully alleges as follows:

## NATURE OF THE ACTION

1.     This case arises out of the biased and wrongful actions and inactions of Defendant Indiana University Bloomington ("IU" or the "University") in investigating and adjudicating cross-allegations of sexual misconduct brought by and against IU students John Doe and Jane Roe[2] ("Roe").

---

[1] Plaintiff is filing herewith a motion to proceed under pseudonym.
[2] Jane Roe is a pseudonym.

2.      In investigating and adjudicating the charges brought by Roe against Doe, and the charges initiated by Doe against Roe, IU conducted a process infected with gender bias when it employed disparate procedures and relied upon archaic presumptions about males and females in reaching a finding of responsibility against Doe, while finding Roe not responsible for the charges.

3.      In the course of its investigation and adjudication process, IU committed numerous procedural errors and violations of its own policy, all of which led to an erroneous finding of responsibility against Doe and a severely unwarranted sanction of expulsion, while Roe was found not responsible and faced no consequences.

4.      On the morning of July 5, 2020, Roe initiated sexual contact with Doe at her off-campus apartment. Roe was sober during this encounter, while Doe was highly intoxicated from alcohol, marijuana, Valium, and cocaine. Doe woke up at Roe's apartment at around 11:30 a.m. on July 5, 2020, unsure of what happened or where he was.

5.      That morning, while Doe was still asleep, Roe and her friend ("Witness 1") went to the hospital, where Roe had a SANE examination performed, however she never disclosed the results of this exam during IU's investigation of Roe's complaint.

6.      On September 14, 2020, Roe contacted the Bloomington Police Department to report an allegation of sexual assault against Doe. Bloomington Police Detective Chris Scott interviewed Roe while Hannah Jones, the Monroe County Prosecutor, took notes on the interview.

7.      Detective Scott and Prosecutor Jones informed Roe that they could not file a sexual assault charge based upon the information Roe provided about the interaction.

8.      Disappointed that the Bloomington Police found her allegations insufficient to move forward, on the same day (September 14, 2020), Roe submitted an online report to IU. Roe

subsequently met with IU's Office of Student Conduct ("OSC") about her allegation against Doe. By this time, Roe's initial account had changed to include an allegation that Doe utilized force.

9.      On November 13, 2020, Doe submitted a written statement to OSC in response to Roe's complaint. Upon reflection, in preparing his statement and repeatedly reliving troubling memories of that night with Roe, Doe came to recognize the fact that he had been sexually assaulted by Roe. Thus, along with his written statement, Doe submitted a formal complaint reporting that while he was incapacitated and without his consent, Roe kissed him, fondled his penis, and penetrated her vagina with his penis.

10.     In flagrant violation of Doe's constitutional right to due process as well as his rights under the University's Sexual Misconduct Policy, IU failed to inform Doe which procedures applied to his case, given the procedures varied depending on the location of the conduct at issue.

11.     On March 25, 2021, the University held a sexual misconduct hearing to resolve the cross-complaints against Doe and Roe.

12.     The hearing panel found Doe responsible for sexual penetration by force through coercion and without consent. The hearing panel inexplicably reached this decision despite the fact that (a) Roe repeatedly acknowledged that she was sober, (b) Roe admitted she directed the entire sequence of events leading up to sex, and (c) Roe's account repeatedly changed and intensified after the initial version she gave police.

13.     The hearing panel found Roe not responsible on the grounds that she did not know or should not have known that Doe was incapacitated. This decision directly contradicted University policy indicating that Roe, as the one who initiated sexual contact by leaning over and kissing Doe, was responsible for obtaining consent, which she failed to do. The finding also

ignored the accounts of Doe and Roe's friend, Witness 1, who described Doe doing drugs and drinking alcohol throughout the day, evening, and early morning of July 4-5, 2020.

14.    Upon its deliberations, the hearing panel expelled Doe from IU. The hearing panel did not sanction Roe at all.

15.    Doe promptly appealed the hearing panel's decision on the grounds of procedural irregularity that affected the outcome and disproportionate sanction. On May 5, 2021, the University's Associate Vice Provost for Student Affairs, Kathy Adams Riester, rejected Doe's appeal in a brusque two-and-a-half-page letter.

16.    As a result of the University's unlawful and discriminatory actions, Doe was improperly expelled from IU in May 2021, and his transcript now bears a permanent mark of expulsion for violations of the University's conduct policies, forever tarnishing his reputation and severely damaging his future educational and professional prospects.

17.    By selectively enforcing its policies to Plaintiff's detriment, reaching an erroneous outcome, and imposing an unreasonable sanction, Defendants displayed discriminatory bias on the basis of Plaintiff's gender in violation of Title IX of the Education Amendments of 1972.

18.    By failing to follow the University's own policies and depriving Plaintiff of a meaningful opportunity to be heard, Defendants violated Plaintiff's fundamental right to due process.

19.    As a result of Defendants' discriminatory and unlawful conduct, Plaintiff has sustained damages, including but not limited to past and future economic losses, reputational harm, and diminished/lost future educational and career prospects.

20.    Accordingly, Plaintiff brings this action to obtain monetary and injunctive relief.

## THE PARTIES

21.     Plaintiff is a natural person, citizen of the United States, and resident of the State of New Jersey. At all times relevant to this Complaint, Plaintiff was a student at IU and resided either at his off-campus house in Indiana or at his parents' home in New Jersey.

22.     Defendant IU is a public research university with an undergraduate student enrollment of approximately 35,000 students, with an address of 107 South Indiana Avenue, Bloomington, Indiana 47405.

23.     At all times relevant to this Complaint, Defendant IU received and continues to receive federal funding and is therefore subject to liability under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) (hereinafter "Title IX").

24.     At all times relevant to this Complaint, Defendant Indiana University Board of Trustees (the "Trustees") was and is the governing body for the Indiana University System. It is composed of nine (9) trustees, six (6) of whom are appointed by the Governor of Indiana, and its business is overseen by six (6) officers.

25.     At all times relevant to this complaint, Defendant Kathy Adams Riester ("Riester") was and is Associate Vice Provost for Student Affairs at IU.

26.     At all times relevant to this complaint, Defendant Latosha Williams ("Williams") was the Associate Director for Residence Life and Director of Student Conduct.

27.     John Doe and Defendants IU Bloomington, Indiana University Board of Trustees, Riester, and Williams are sometimes hereinafter collectively referred to as the "Parties."

## JUJRISDICTION AND VENUE

28.     This Court has federal question, diversity, and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, § 1332, and § 1367 because: (i) the federal law claims arise under the

constitution and statutes of the United States; (ii) the parties are residents of different states and the amount in controversy exceeds $75,000.00, and (iii) the state law claims are so closely related to the federal law claim as to form the same case or controversy under Article III of the United States Constitution.

29.    This Court has personal jurisdiction over Defendant IU on the grounds that it is conducting business and is principally located in Bloomington, Indiana.

30.    This Court has personal jurisdiction over Defendant Indiana University Board of Trustees on the grounds that it is the governing body of IU Bloomington.

31.    This Court has personal jurisdiction over the individual Defendants on the grounds that they were at all times relevant to this action employed by IU.

32.    Venue for this action properly lies in this district pursuant to 28 U.S.C. §1391(b)(2) because the events or omissions which give rise to Plaintiff's claims took place in Bloomington, Indiana, which is located in the Southern District of Indiana.

## **FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS**

**I.    The University Faces Significant Pressure to Aggressively Combat Sexual Misconduct**

### A.    *Context Following the 2011 Dear Colleague Letter*

33.    On April 4, 2011, the Office for Civil Rights ("OCR") of the United States Department of Education ("DOE") issued a guidance document on sexual violence, the "Dear Colleague Letter," U.S. Department of Education, *Dear Colleague* (Apr. 4, 2011), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf    (hereinafter    *Dear Colleague Letter* or *DCL*), interpreting Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, and its regulations, 34 C.F.R. Part 106 (2018). Title IX's regulations require

colleges and universities to have prompt and equitable grievance procedures to resolve complaints of sex discrimination, including sexual harassment.

34.     While directing schools "to take immediate action to eliminate the harassment, prevent its recurrence, and address its effects," *Dear Colleague Letter*, *supra*, at 4, the DCL de-emphasized fair process by, among other things, being silent on a presumption of innocence, directing schools to "minimize the burden on the complainant," *id.* at 15–16, discouraging cross-examination, *id.* at 12, requiring use of the "preponderance of the evidence" standard rather than the higher "clear and convincing evidence" standard, which some colleges were using, *id.* at 11, and prohibiting certain forms of alternative dispute resolution, *id.* at 8.

35.     The DCL, while not completely ignoring due process concerns, suggested that schools should focus more on victim advocacy.

36.     Despite its purported purpose as a mere guidance letter, the Department of Education treated the DCL as a binding regulation.

37.     In a related guidance document published on April 29, 2014 by the U.S. Department of Education, *Questions and Answers on Title IX and Sexual Violence* (Apr. 29, 2014), https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf (hereinafter *2014 Q&A*), OCR advised schools that hearings should be "conducted in a manner that does not inflict additional trauma on the complainant," *id.* at 31, and persons implementing schools' grievance procedures should be trained on "the effects of trauma, including neurobiological change," *id.* at 40.

38.     Like the DCL, the 2014 Q&A was aimed at addressing educational institutions' sexual misconduct policies, including the procedures schools "must" have in place "to prevent

sexual violence and resolve complaints" and the elements that "should be included in a school's procedures for responding to complaints of sexual violence."

39. In the same month that OCR issued its 2014 Q&A on Title IX, the White House issued a report titled *Not Alone*, which included a warning that if OCR finds a school in violation of Title IX, the "school risks losing federal funds." *See* White House Task Force to Protect Students from Sexual Assault, *Not Alone* (Apr. 2014), available at https://obamawhitehouse.archives.gov/sites/default/files/docs/report_0.pdf. The report further advised that the Department of Justice ("DOJ") shared authority with OCR for enforcing Title IX, and could therefore initiate investigation, compliance review, and/or litigation against schools suspected of violating Title IX.

40. In June 2014, Catherine Lhamon, the Assistant Secretary for Civil Rights from 2013 to 2017, testified before the United States Senate that if OCR could not secure voluntary compliance with its Title IX guidance from a college or university, the agency could initiate administrative action to terminate federal funds or refer the case to the Department of Justice. Testimony of Catherine E. Lhamon, Assistant Secretary for Civil Rights, U.S. Department of Education (June 26, 2014), https://www2.ed.gov/about/offices/list/ocr/correspondence/testimony/20140626-sexual-violence.pdf.

41. Over the past decade, universities across the country, including Indiana University, have adopted "procedural and substantive policies intended to make it easier for victims of sexual assault to make and prove their claims and for the schools to adopt punitive measures in response." *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 572-73 (D. Mass. 2016) ("The goal of reducing sexual assault, and providing appropriate discipline for offenders, is certainly laudable. Whether the

elimination of basic procedural protections—and the substantially increased risk that innocent students will be punished—is a fair price to achieve that goal is another question altogether.")

42.     In *Doe v. Purdue University*, the Seventh Circuit recognized that the Dear Colleague Letter provided a motive for schools to protect their federal funding by tilting the process against respondents in order to increase the number of punishments imposed. 928 F.3d 652, 668 (7th Cir. 2019). "The resulting track record of enforcement would permit [the school] to signal its commitment to cracking down on campus sexual assault, thereby fending off any suggestion that it was not complying with the Department of Education's directive." *Id.*

43.     Wielding the powerful weapons of federal funding and public rebuke, OCR and its Dear Colleague Letter pressured colleges and universities to avoid any possible appearance of failing to punish sexual misconduct. *See, e.g.*, *Doe v. Purdue Univ.*, 928 F.3d 652, 668 (7th Cir. 2019); *Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018); *Doe v. Miami Univ.* 882 F.3d 579, 594 (6th Cir. 2018); *Doe v. Columbia Univ.* 831 F.3d 46, 57 (2d Cir. 2016); *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 572-73 (D. Mass. 2016).

44.     To support its enforcement of the DCL, OCR hired hundreds of additional investigators. To date, OCR has conducted *over five hundred* investigations of colleges for the potential mishandling of complaints of sexual misconduct. *See Title IX: Tracking Sexual Assault Investigations*, Chronicle of Higher Education, https://projects.chronicle.com/titleix/ (last visited April 11, 2023).

45.     Following the DCL, OCR put considerable pressure on universities to treat all those accused of sexual misconduct with a presumption of guilt. The Chronicle of Higher Education noted that "Colleges face increasing pressure from survivors and the federal government to improve the campus climate." *Presumed Guilty: College men accused of rape say the scales are*

*tipped against them*, Chronicle of Higher Education, September 1, 2014. In the same article, the Chronicle noted that different standards were applied to men and women: "Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no. That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent."

46.    Significantly, the scenario was flipped here: due to Doe's incapacitation from drugs and alcohol and Roe's sober state, Roe was physically able to initiate sex, while Doe was incapable of doing so and by definition, incapable of providing effective consent. Despite this, and despite the fact that if the gender roles had been reversed IU would undoubtedly have punished the sober male instigator, IU chose to find Jane Roe not responsible and Doe responsible for violations of its policies.

47.    Moreover, a 2014 white paper issued by the Association of Title IX Administrators (ATIXA), titled *Equity is such a Lonely Word*, functionally directed colleges to tilt their investigations in favor of women:

> [C]ampuses for so many years considered only (or primarily) the rights and situation of the accused. Thus, equity ends up feeling like a shift to victim's rights, even though it is not. Ultimately, the pendulum should shift to the middle, rather than to either party, but ***because victims have been historically been accorded 3/5 of the rights of an accused individual (or less), and victims are typically women, equity may require institutions to recalibrate the pendulum*** to right the historical imbalance.

(Emphasis added).

48.    On September 22, 2017, OCR rescinded the 2011 DCL and 2014 Q&A and noted that OCR had been widely criticized for putting "improper pressure upon universities to adopt

procedures that do not afford fundamental fairness." U.S. Department of Education, *Dear Colleague* (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf (quoting Members of the Penn Law School Faculty, *Sexual Assault Complaints: Protecting Roes and the Accused Students at Universities*, Wall St. J. (Feb. 18, 2015), http://online.wsj.com/public/resources/documents/2015_0218_upenn.pdf).

49.     As Betsy Devos, former Secretary of Education, noted, the rescission of the DCL was largely motivated by "[t]he truth . . . that the system established by the prior administration has failed too many students," specifically because "[t]he notion that a school must diminish due process rights to better serve the 'victim' only creates more victims." Press Release, Secretary DeVos Prepared Remarks on Title IX Enforcement (Sept. 7, 2017), *available at* https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement.

50.     At the same time, the DOE issued proposed new Title IX regulations that were intended to restore constitutional due process and fundamental fairness, which the DOE recognized had been diminished by the 2011 DCL. Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,026, 30,047 (May 19, 2020) (to be codified at 34 C.F.R. pt. 106). These new regulations also conveyed the importance of a neutral starting point for adjudicating claims of sexual misconduct. For example, while the Dear Colleague Letter referred to the accused party as "alleged perpetrator," the new Title IX regulations referred to the accused party as "respondent."

51.     On May 6, 2020, the Department of Education released its final regulations on Title IX, which took effect on August 14, 2020.[3] *Id*. The regulations make clear, *inter alia*, that schools can be found to discriminate on the basis of sex by treating either the complainant or the respondent

---

[3] The DOE published the final regulations in the Federal Register on May 19, 2020.

unfairly; that parties must be provided a live hearing with cross-examination and access to the complaint, the evidence from the investigation, and a written decision carefully addressing the evidence; that respondents must be presumed not responsible; that all relevant evidence must be evaluated objectively; that investigators and decisionmakers must receive non-biased training, may not rely on sex stereotypes, and must be impartial; and must explain delays for good cause in the timeframe of the process in writing.

52.     The May 2020 regulations took effect on August 14, 2020.

53.     On June 23, 2022, the Biden Administration issued a Notice of Proposed Rulemaking regarding proposed changes to the regulations once again, proclaiming that the amendments will "restore crucial protections for students who are victims of sexual harassment, assault, and sex-based discrimination- a critical safety net for survivors that was weakened under previous regulations."

54.     As these most recent proposed regulations have not yet been formally adopted, they are not applicable to the disciplinary case involving Plaintiff.

55.     As this Complaint will demonstrate, IU implements its sexual misconduct policies in a manner intended to protect women, and endeavors to find male accused students responsible and punish them harshly, in order to avoid any further institutional harm resulting from negative media attention and/or the risk of losing federal funds pursuant to an OCR investigation.

B.      *The University Faces Campus Unrest Over Publicized Sexual Assault*

53.     In addition to the foregoing events, IU's actions and decision-making in its handling of Jane Roe's complaint against Plaintiff was informed by ongoing external and internal pressures on IU to aggressively pursue complaints of sexual misconduct against male respondents.

54.    For instance, on September 5, 2020, a female IU student was sexually assaulted by two male IU students in a dormitory on campus.

55.    One of the alleged perpetrators posted an extremely disturbing photo on Snapchat of the female lying on her back naked with her eyes closed, seemingly asleep or unconscious. Two shirtless males are kissing her chest, and one of the males has his hand between her legs. Mary Claire Molloy, *Apparent rape seen on Snapchat reported to IU Police Department*, The Bloomingtonian, Sept. 10, 2020.

56.    This graphic photo spread rapidly throughout the IU community and beyond, "reaching students across the country" and inciting rage throughout those who viewed the image. *Id.*

57.    On September 9, 2020, the IU Police Department ("IUPD") escorted one of the two alleged perpetrators out of his dormitory, with his hands restrained behind his back, and placed him inside a police vehicle. IUPD questioned the suspect and then released him. *Id.*

58.    Students had rejoiced at the sight of the suspect being taken into IUPD custody, sharing videos of the escort and assuring others that they were safe. Thus, when the alleged perpetrator returned to his dorm an hour later, students were surprised and angered. *Id.*

59.    On September 10, 2020, IU students and Bloomington community members gathered on campus and held a protest against sexual assault. The protesters occupied the area outside of the suspect's dormitory, held signs, and passed around a microphone as people shared their experiences with sexual assault. *Id.*

60.    The sexual assault, as well as the ensuing unrest on campus, sparked anger in many IU community members and was covered by multiple news outlets.

61.     On information and belief, IU's institutional self-interest in avoiding continued bad press and campus unrest resulted in an inherent gender bias which directly affected Plaintiff's case, which was initiated during the exact same time frame as the foregoing events, directly contributing to an erroneous finding and the wrongful expulsion of Doe.

## II.     Agreements, Representations, Covenants and Warranties Between Plaintiff and IU

61.     OSC consistently stated that it applied IU Policy *UA-03: Discrimination, Harassment, and Sexual Misconduct* (the "Policy") to the cross-complaints between Doe and Roe.

62.     The Policy states that it applies to reports received by IU on or after August 14, 2020. Although the alleged incident between Doe and Roe occurred on July 5, 2020, before the Policy (and the revised Title IX regulations) took effect, Roe submitted her online report to IU on September 14, 2020. Thus, according to the Policy, it was applicable to the Doe/Roe matter based upon the date IU received Roe's report.

63.     The Policy defines the scope of the University's jurisdiction, specifying that it:

> applies to any reported discrimination, harassment and/or sexual misconduct that is alleged to have occurred on campus, in the context of any university program or activity, or among current members of the [U]niversity community off campus. This policy also applies to reported discrimination, harassment and/or sexual misconduct that has a continuing adverse effect or creates a hostile environment for one or more individuals.

64.     Thus, the Policy purportedly applies to all incidents of discrimination, harassment, and sexual harassment among current members of the IU community, regardless of whether they occurred on- or off-campus.

65.     Under the Policy, the "Sexual Misconduct & Title IX Coordinator" and the "Director of Institutional Equity" both "oversee the [U]niversity's review, investigation, and resolution of those reports to ensure the [U]niversity's compliance with applicable law and this

[P]olicy." Jennifer Kincaid was the Sexual Misconduct & Title IX Coordinator at the time of Doe's case.

66.     The Deputy Sexual Misconduct & Title IX Coordinators are responsible for determining whether each complaint submitted to OSC meets the criteria to proceed under the Policy's Title IX Complaint Resolution Procedures. The Deputy Sexual Misconduct & Title IX Coordinators also "assist the University [Sexual Misconduct & Title IX] Coordinator in ensuring that outreach, response, investigation and adjudication occurs in accordance with applicable law and this [P]olicy." Libby Spotts served as the Deputy Sexual Misconduct & Title IX Coordinator involved in Doe's case.

67.     Campus Equity Officials "assist the University's Director of Institutional Equity to ensure that outreach, response, investigation and adjudication occurs in accordance with applicable law and this [P]olicy."

A.     _Rights of Both Parties Under the Policy_

68.     In all complaint resolution procedures covered by the Policy, both parties have the right "[t]o be fully informed of university policies and procedures, as well as the nature and extent of all alleged violations within the allegation."

69.     Both parties have the right "[t]o be treated with respect."

70.     Both parties have the right to "adequate, reliable, and impartial investigation and appropriate resolution of all complaints of discrimination, harassment and/or sexual misconduct."

71.     Both parties also have the right "[t]o have appeal rights as afforded under the applicable complaint resolution procedures."

B.  *Different Sets of Procedures and Definitions Under The Policy*

72.  The Policy stipulates that different sets of procedures apply to different incidents under the same Policy. "The applicable complaint resolution process for addressing a formal complaint will depend on a number of factors, including the type and nature of the alleged conduct, the role of the parties, where the alleged conduct occurred, and applicable law."

73.  In other words, the Policy applies to all reports of sexual misconduct submitted on or after August 14, 2020, whether they took place on- or off-campus, but the resolution process and procedures vary depending on the circumstances of the complaint.

74.  In addition to varying procedures, the Policy utilizes different definitions of the same terms: "[s]ome covered behaviors will have different definitions depending on whether the complaint is proceeding under Title IX or University Complaint Resolution Procedures."

75.  The Policy provides that when someone reports "discrimination, harassment, and/or sexual misconduct," a designated IU official will promptly reach out to them and "offer to meet and provide written information about . . . [p]otentially applicable university procedures, including to whom and how a formal complaint can be filed, as well as the individual's rights and options within the university proceedings . . . ."

76.  According to the Policy, "applicable complaint resolution procedures" are determined "upon receipt of a formal complaint after a report of discrimination, harassment and/or sexual misconduct . . . depending on whether the Respondent is a student or employee, and whether the matter falls within the scope of Title IX or the other provisions of this policy."

77.  A complaint falls under the Policy's Title IX Complaint Resolution Procedures if it meets the following three criteria:

1) At the time the formal written complaint is submitted and signed, the Complainant is a current IU student, employee, or is currently attempting to participate in an IU program or activity;

2) The behavior alleged occurred as part of an IU program or activity; and

3) The behavior alleged occurred against a individual [sic] in the United States.

78. If a complaint does not satisfy any of the above criteria, the Policy dictates that the complaint must be dismissed under the Title IX Complaint Resolution Procedures.

79. In that event, the Policy states that the complaint may then be investigated under the University Complaint Resolution Procedures or other procedures if applicable.

80. The Policy indicates that the parties will be notified if a complaint does not meet the criteria for the Title IX Complaint Resolution Procedures:

> (g) In the event the complaint is dismissed under Title IX Complaint Resolution Procedures at any point, once notice of Title IX dismissal is given to the parties, either party may appeal that decision to the designated official. If the Coordinator chooses not to proceed with the complaint under any university procedures, once notice is given to the parties, either party may appeal that decision to the designated official . . . .

81. Furthermore, the Policy explains that once an investigation is initiated,

> [t]he investigation may include, but is not limited to interviews with the Complainant, the Respondent, and other witnesses identified as having information relevant to the allegations made, as well as the examination of written statements by the parties, relevant documents, and other relevant information. Information for the investigation may be provided by Complainants, Respondents, witnesses identified by any party, or the [U]niversity. Any individual believed to have information relevant to an investigation may be contacted and requested to make an appointment to discuss the matter. The [U]niversity shall determine what information and evidence will be included in the Investigation File.

82. Under the Policy, "[p]ossible sanctions for cases in which a student is found in violation of this policy and the Student Code for acts of sexual misconduct include, but are not limited to formal warnings, behavioral assessment and/or counseling, required educational training, disciplinary probation, suspension, and/or permanent expulsion."

83.     A student may appeal the outcome following an investigation, hearing, and finding. Appeals may be based on certain criteria including "[p]rocedural irregularity that affected the outcome" or "[t]he sanction imposed is disproportionate to the violation(s) committed, in light of all relevant aggravating and mitigating factors, and in consideration of applicable university guidelines."

C.      *Definitions Used in the Policy*

84.     The Policy highlights that the University "prohibits discrimination on the basis of sex or gender in its educational programs and activities."

85.     The Policy unequivocally states that "[t]he person initiating the sexual act is responsible for getting consent."

86.     "Consent" is defined as "[a]n agreement expressed through affirmative, voluntary words or actions, and mutually understandable to all parties involved, to engage in a specific sexual act at a specific time."

87.     The Policy further makes clear that "[c]onsent cannot be given by someone who is incapacitated."

88.     "Incapacitated" is defined in the following manner:

> An individual is incapable of consent if they are unable to understand the facts, nature, extent, or implications of the situation due to drugs, alcohol, a mental disability, being asleep or unconscious, or based on their age (pursuant to Indiana law). With respect to alcohol and drugs, intoxication and/or impairment is not presumptively equivalent to incapacitation. Consent does not exist when the individual initiating sexual activity knew or should have known of the other individual's incapacitation.

89.     "Force" is defined as:

> The use of physical force which overcomes the individual's resistance; or the threat of physical force, express or implied, against the individual or a third-party that places the individual in fear of death or in fear of serious personal injury to the individual or a third-party where the individual

reasonably believes that the actor has the present or future ability to execute the threat.

90.    "Sexual penetration" is defined as "[s]exual intercourse in its ordinary meaning, cunnilingus, fellatio, anal intercourse, or any intrusion, however slight, of any part of the actor's or individual's body or any object manipulated by the actor into the genital or anal openings of the individual's body."

### a. Definitions in the Policy's Title IX Complaint Resolution Procedures

91.    The Title IX Complaint Resolution Procedures provide that sexual assault includes forcible sex offenses, defined as "[a]ny sexual act directed against another person, without the consent of the Complainant, including instances where the Complainant is incapable of giving consent."

92.    "Forcible rape" is defined as "[p]enetration, no matter how slight, of the vagina or anus with any body part or object, or oral penetration by a sex organ of another person, without the consent of the Complainant."

93.    "Forcible fondling" is defined as "[t]he touching of the private body parts of another person (buttocks, groin, breasts) for the purpose of sexual gratification, forcibly and/or against that person's will (non-consensually) or not forcibly or against the person's will in instances where the Complainant is incapable of giving consent because of age or because of temporary or permanent mental or physical incapacity.

94.    "Sexual harassment" is defined as:

> Conduct on the basis of sex or that is sexual in nature that satisfies one or more of the following:
>
> 1) An employee of the university conditioning the provision of an aid, benefit, or service of the university on an individual's participation in unwelcome* sexual conduct; and/or

2) Unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity.

Sexual Harassment also includes sexual assault, dating violence, domestic violence and stalking defined herein. Severity, pervasiveness, and objective offensiveness are evaluated based on the totality of the circumstances from the perspective of a reasonable person in the same or similar circumstances as the Complainant, including the context in which the alleged incident occurred and any similar, previous patterns that may be evidenced.

### b. Definitions Under the University Complaint Resolution Procedures

95.    Under the Policy's University Complaint Resolution Procedures, sexual assault includes non-consensual sexual penetration and non-consensual sexual contact.

96.    "Non-consensual sexual penetration" occurs "when an individual subjects another individual to sexual penetration without the consent of the individual, and/or by force."

97.    "Non-consensual sexual contact" is "intentional sexual touching by an individual of the intimate area of another individual (i.e., genitals, breasts, buttocks) or intentional sexual touching of another individual with any of these body parts, without the consent of the individual, and/or by force."

98.    "Sexual harassment" is defined as:

Conduct on the basis of sex or that is sexual in nature that satisfies one or more of the following:

1) A member of the university conditioning the provision of an aid, benefit, or service of the university, on an individual's participation in unwelcome* sexual conduct.
2) Unwelcome conduct determined by a reasonable person, to be so severe, pervasive or persistent, and objectively offensive, that it effectively denies a person equal access to the university's education program or activity.

Sexual Harassment also includes sexual assault, dating violence, domestic violence and stalking defined herein. Severity, pervasiveness, persistence,

and objective offensiveness are evaluated based on the totality of the circumstances from the perspective of a reasonable person in the same or similar circumstances as the Complainant, including the context in which the alleged incident occurred and any similar, previous patterns that may be evidenced.

### III.    Background Information on Doe's Enrollment at IU

99.    Doe enrolled at IU in fall 2018 after applying early action.

100.    Doe chose to attend IU over other universities because upon Doe's first visit and tour, IU felt particularly special and like home to him.

101.    Doe was especially looking forward to majoring in sports management and marketing at IU, which was his life-long dream.

102.    Doe attended IU with great excitement and flourished during his first and second years there, which were filled with positive experiences.

### IV.    Events of July 4-5, 2020

103.    On July 4, 2020, the off-campus fraternity house in which Doe lived hosted a Fourth of July party together with the house next door. By the time alumni began arriving at around noon, Doe had already started drinking. Over the next several hours, Doe caught up with friends, played beer pong, and did a line of cocaine.

104.    At around 4:00 p.m., Doe saw Witness 2, Doe's friend and a former IU student, together with Roe and her friend, Witness 1, neither of whom Doe had met before. Doe introduced himself to Roe and Witness 1. Doe, Roe, Witness 1, and Witness 2 hung out together at the party.

105.    At around 5:00 p.m., the four of them went to Doe's room, where they all listened to music, drank shots of vodka, and Doe and Witness 2 smoked marijuana. Doe also left his room and made quesadillas for the four of them. Before they all left Doe's room at around 10:00 p.m., Doe took one Valium pill.

106.    The group then went outside and watched a bonfire from the roof of Doe's fraternity house, hanging out among other students and alumni on the roof. At around 12:00 a.m., Witness 3, an alumni and Doe's former fraternity brother, arrived and tried to talk the group into going to a local strip club called Night Moves.

107.    Doe said he did not want to go to Night Moves, but Roe, Witness 1, and Witness 3 all wanted to go and encouraged Doe to join them. At around 1:15 a.m., Doe agreed to go with them, and Witness 3 called an Uber that drove Doe, Roe, Witness 1, and Witness 3 to Night Moves.

108.    When the group arrived at Night Moves, the bouncer refused to let in Doe, Roe, and Witness 1 because they were underage. Doe then requested a Lyft to pick the three of them up. While they waited for the Lyft, Doe took half of a Valium pill.

109.    Roe was aware of Doe's Valium intake throughout the evening because he had talked about it. Doe also recalled a discussion in his room between himself, Roe, Witness 1, and Witness 2, in which Witness 1 who worked at a pharmacy, cautioned that taking Valium while drinking alcohol can enhance the effects of each substance and "fuck you up."

110.    Doe tried to set two stops on the Lyft ride so he could get dropped off separately from Roe and Witness 1, but he was unable to do so. Doe, Roe, and Witness 1 all got dropped off at Roe's apartment at around 2:00 a.m.

111.    When Doe, Roe, and Witness 1 arrived at Roe's apartment, Witness 1 offered Doe white wine and Smirnoff Ice, both of which Doe drank. The three watched a movie and shared a frozen pizza.

112.    At some point, Doe asked Roe if he could stay over because his phone battery was dead and he felt too intoxicated to get home. Roe said yes. At around 4:00 a.m., after checking with Roe that she was okay being left alone with Doe, Witness 1 left Roe's apartment.

113.    Doe's memory of what happened thereafter is blurry, but he recalled that Roe took a shower, and afterward Doe asked if he could take a shower. Before getting in the shower, Doe took another half of a Valium pill. He was exhausted, unbalanced, and extremely intoxicated by that point.

114.    After Doe took a shower, he asked Roe where he should sleep, whether on the floor or downstairs. Roe asked Doe if he wanted to sleep in her bed, and Doe laid down in her bed. Doe remembered feeling extremely dizzy when he closed his eyes and trying not to throw up. Shortly thereafter, Doe passed out.

115.    At some point, Doe awoke to Roe talking to him and playing with his hair. Doe shared his sadness over the death of his grandfather two months earlier and the recent breakup Doe had with his girlfriend.

116.    Roe leaned over and began kissing Doe and undressing herself. Doe did not remember kissing Roe back, but assumed he must have due to how long the kissing lasted.

117.    Roe then told Doe she wanted him to perform oral sex on her. Doe asked if she was sure, Roe said yes, and Doe performed oral sex. Roe ended the oral sex by grabbing Doe under his arms and pulling him toward her so that he moved on top of her.

118.    Once Doe was on top of Roe, she grabbed his penis out of his boxers and began rubbing it against her vagina. Doe was taken aback by this because he was not wearing a condom, which concerned him. Doe also did not want to have sex with someone whom he had just met, as he knew nothing about her sexual health or sexual history.

119.    Doe's memory of what happened afterward is spotty and incomplete, but he believed the two had sexual intercourse even though Doe did not, and could not, consent due to

his condition and level of extreme intoxication. Doe could not remember his penis penetrating Roe's vagina, but he remembered ejaculating.

120.    Doe remembered Roe lying next to him after intercourse and asking what would happen between Doe and his ex-girlfriend. Doe said that he did not know. Roe then said, "I hope I don't get too attached to you." Doe responded, "Why would you? We just met."

121.    Doe fell back asleep, and upon waking up at around 11:30 a.m., Doe panicked. He had blacked out, his phone was dead, he was not sure where he was, and neither Roe nor anyone else was around.

122.    Doe found a charger so he could power on his phone, then immediately called his mother, told her that he relapsed and was ashamed of himself, apologized to her, and said he was alone in a strange apartment and did not know where he was.

123.    After speaking with his mother, Doe called and texted Roe a few times to ask where she was and what happened the night before. Doe then left Roe's apartment and returned home.

## V.    Aftermath of July 5, 2020

122.    At around 1:00 p.m., Witness 1 messaged Doe on Instagram and told him that Roe had gone to the hospital because she felt she was sexually assaulted. This completely shocked Doe, who could not comprehend why Roe would say anything like that.[4]

123.    Doe replied, "There is no way. I couldn't have." He panicked again, sending a series of unanswered messages and telling Witness 1 he could not remember what happened due to his incapacitation from drugs and alcohol. Doe stated:

> But there has to be some mistake \ Maybe we had sex but there is no way I forced myself on her \ I have never done anything like that \ Keep me updated. If she needs anything. There has to be some misunderstanding tho [sic]. Jesus I feel so awful.

---

[4] Importantly, Witness 1 later told the investigator that she had not spoken with Roe in detail about what Roe alleged to have happened that evening.

124.   This alarming information, combined with the shame and frustration Doe felt over relapsing amidst a continuous struggle with drug and alcohol use, sent Doe spiraling into a state of complete distress. Alone and confused, and trying to figure out what happened, Doe frantically messaged Witness 1.

125.   At one point, Doe said, "I remember flashes \ She kissed me \ I must have take [sic] that as a yes \ I can't beleive [sic] it." In that moment, Doe briefly credited what someone else was telling him because he could not yet remember anything that happened the night before, and he was incredibly disappointed with himself for having a substance use disorder, relapsing, and blacking out.

126.   After several more messages, Doe said, "I didn't even want to have sex I don't even know why it got there. I wasn't in the mood. I wasn't looking for that I can't beleive [sic] it." Soon thereafter, Doe said, "I remember more and more now," and Doe described that Roe asked him to do things and he obliged. Doe continued, "I understand she may have regretted sleeping with me. And there is gray area but I just thought I'd say this now that I remember it."

127.   On July 9, 2020, soon after this deeply upsetting experience, Doe left IU and returned to his home state of New Jersey to get treatment for substance use disorder. Doe stayed at his parents' home as he needed to get healthy and was in no shape to return to IU.

128.   At home with his thoughts, Doe considered his final comment to Roe on July 5, when he asked her why she would get attached if they just met, and Doe felt badly about the coldness of his statement. Doe wished he had said something different, but he made that comment due to feeling uncomfortable over his level of vulnerability and extreme intoxication at the time.

129.   Doe came to realize that Roe's remark about hoping not to get too attached was Roe's way of telling Doe that she had feelings for him. Doe believed this because of Roe's outward

flirtation and affection toward him throughout the evening and early morning of July 4 and 5. Roe also indicated her interest in Doe on July 16, after the alleged incident, when she texted Doe a picture from July 4 of him in his room and said, "I do wish I would've gotten to know you."

A.    *Roe Meets with Bloomington Police and Monroe County Prosecutor*

130.    On September 14, 2020, Roe contacted the Bloomington Police Department. Roe was interviewed by Bloomington Police Detective Chris Scott, while Hannah Jones, the Monroe County Prosecutor, took notes.

131.    Upon hearing Roe's account, Detective Scott asked whether Doe pulled Roe's arms back or used any force. Roe said that she did not remember if Doe was holding her arms, but it was "kind of like cuddling a little." Roe stated that she was lying on her side and Doe was behind her, like "spooning."

132.    Detective Scott asked Roe if she felt like she could have gotten up or moved away without Doe stopping her, and Roe said, "yeah maybe." Detective Scott told Roe that a sexual assault, by legal definition, required some type of force.

133.    Detective Scott and Prosecutor Jones then informed Roe that the requisite element of force was missing, so they could not file a sexual assault charge. Prosecutor Jones explained to Roe what force looks like under Indiana law and that penetration by itself does not constitute force.

134.    After Roe's interview on September 14, 2020, the Bloomington Police contacted Doe and asked him to come in for a meeting. Doe told the police that he could not go in for a meeting because he was no longer in Bloomington. The police accepted this and never contacted Doe again.

B.    *Roe Reports to IU*

135.    On September 14, 2020, the same day the Bloomington Police Department declined to move forward with Roe's allegations, Roe filed a report with IU. This time, Roe's account was revised to now include a description of force, which Roe understood was required to meet the legal definition of sexual assault in Indiana.

136.    On September 23, 2020, Roe and her advisor Samantha Hammett met via video conference with two members of OSC: Taylor Struble, Sexual Misconduct Investigator, and Laura Mals, Associate Director. Roe told Struble and Mals that Doe held her arms down by her head, with his hands wrapped around her forearms, and pushed her arms back against her bed.

137.    On October 20, 2020, nearly one month later, OSC notified Doe of the allegation that he violated the Sexual Misconduct Policy by sexually harassing and/or assaulting Roe by force and without her consent. OSC stated that Doe allegedly vaginally penetrated Roe with his penis without a condom after she repeatedly said "no," and held Roe down by her wrists while doing so.

138.    On November 13, 2020, Doe submitted a written statement to OSC in response to Roe's complaint. Upon reflection, in preparing his statement and repeatedly reliving memories of that night with Roe, Doe came to recognize the fact that he was the one who had been sexually assaulted by Roe. Thus, along with his written statement, Doe filed a complaint reporting that Roe kissed him, fondled his penis, and penetrated her vagina with his penis, without a condom, while Doe was incapacitated and without Doe's consent.

VI.    **Flawed Investigation and Adjudication**

A.    *IU Fails to Explain Ambiguous Policy with Multiple Sets of Procedures*

139.    Because the alleged events between Doe and Roe did not occur as part of an IU program or activity, the cross-complaints could not proceed under the Title IX Complaint

Resolution Procedures. The Policy indicates that the parties will be notified if a complaint does not meet the criteria for Title IX Complaint Resolution Procedures.

140.    Doe never received notice of dismissal under the Title IX procedures, as respondent or complainant. OSC nonetheless chose to pursue both cross-complaints, presumably under the University Complaint Resolution Procedures. Not only did OSC fail to tell Doe that the Title IX Procedures did not apply, but—in flagrant violation of Doe's rights as a respondent—OSC never provided Doe with any information about the procedures used in resolving his case.

141.    Upon information and belief, OSC provided Doe with an informational packet stating that there are two sets of complaint resolution procedures, Title IX Complaint Resolution Procedures and University Complaint Resolution Procedures. The packet stated that which procedures may apply will be informed by the particular circumstances alleged in the complaint, and "*[t]he [U]niversity will work with you to explain these processes*." (Emphasis added).

142.    OSC failed to inform Doe which procedures applied and refused to work with Doe or his advisor to explain OSC's processes, in accordance with its own guidelines. When Doe and his advisor repeatedly sought clarification regarding which procedures applied, investigators refused to provide a clear answer, opting instead to give ambiguous replies such as "it's complicated."

143.    On March 18, 2021, Doe received a letter from Libby Spotts, Associate Dean of Students, notifying him that "based on the content of [Roe's October 20, 2020] report," Doe was being charged with sexual harassment and/or sexual assault without consent and/or by force, in violation of the University's policies.

28

144.    The March 18, 2021 notice advised Doe that Roe was also being charged with a violation of the Sexual Misconduct Policy, but did not describe the precise actions of Roe that were under investigation.

145.    The notice further indicated that a hearing for the charges against both parties would take place merely one week later, on March 25, 2021.

B.    *The Sexual Misconduct Hearing*

146.    The evening prior to the hearing, Doe was informed that he could prepare questions for the panel to ask Roe, meaning he would not be able to question her directly, and that he would need to submit the questions by email ahead of time.

147.    On March 25, 2021, the University held a sexual misconduct hearing for the charges against Doe and Roe. The hearing was held remotely and lasted 4.5 hours.

148.    While introducing herself to the hearing panel, Roe called Doe a rapist and asked for him to be "convicted and held accountable." The hearing panel never asked Roe to refrain from violating Doe's rights under the Sexual Misconduct Policy, including the right to be treated with respect.

149.    In her opening statement, Roe called Doe a rapist again, with no censor from the panel. Roe declared:

> I want everybody to make the right decisions, and make this right not just for one rape victim, which is me, but all the rape victims who chose not to come forward or who aren't able to have their stories heard. And I just hope you will recognize that as well—that [Doe] is a rapist and that I am not culpable for anything he is alleging.

150.    Roe called Doe a rapist at least twelve times throughout the 4.5-hour hearing, and the panel never asked her to refrain from doing so.

151.    During the hearing, Roe altered her account yet again, claiming that Doe held her legs apart with his hands. The panel failed to ask Roe any questions about this new detail that was raised for the first time during the hearing.

152.    Roe also alleged for the first time during the hearing that after intercourse, she laid on her back while staring at the ceiling and telling herself not to cry.

153.    Throughout the hearing, Roe did not look up when she spoke and read directly from notes seemingly prepared by someone else, because Roe repeatedly referred to herself in the third person.

154.    Regarding the inconsistencies in her accounts to Bloomington Police and OSC, Roe claimed that "because the prosecutor informed her that what she had originally shared would not meet the criminal definition for restraint or confinement, she was trying to do a better job of explaining what occurred to the OSC investigators."

155.    The hearing panel addressed Roe in a gentle, coddling tone and responded supportively to everything she said. Williams, the Chair of the hearing panel, sounded nervous when addressing Roe, stammering, stumbling over her words, and pausing frequently.

156.    In contrast, Williams' tone was clear and authoritative when she spoke to Doe, and she and the other panel members frequently addressed Doe in a critical and disparaging in manner. For example, Williams snickered while reading aloud one of Doe's previous statements about the sexual contact.

157.    The panel asked Roe very few questions in comparison to the number with which they hammered Doe. Moreover, the panel members asked Doe many questions that they could have also asked Roe, but chose not to. For example, the panel asked what kind of physical response

Doe had at the beginning of the encounter, and what would his response have been if the contact was unwanted.

158.    The panel never asked Roe why she declined to disclose the results of her SANE examination during the investigation. Despite turning over only a hospital receipt and no actual medical records, Roe cited medical records as corroborating evidence during her closing statement.

159.    The panel also failed to contact Detective Scott and Prosecutor Jones to serve as witnesses during the hearing, although they were the people who took Roe's initial statement regarding the encounter, as their testimony would have raised doubt regarding the veracity of Roe's claims.

160.    On April 14, 2021, OSC sent Doe a letter notifying him of the hearing outcome. The letter read:

> You have been found responsible for sexual harassment and sexual assault without consent and by force. You have been found responsible for vaginally penetrating [Roe] with your penis without a condom after she repeatedly said "No" and told you that she did not want to engage in penile-vaginal penetration, and for engaging in force by coercion.

161.    The hearing panel's decision glossed over the fact that Roe repeatedly changed and intensified her story over time. The outcome letter actually stated that the panel found Roe's account most credible because it remained consistent, which is demonstrably false. For example:

- In her initial interview with Bloomington Police, Detective Scott specifically asked Roe, twice, if her arms were held down. In responding, Roe declined to say that her arms were held down. In comparison, Roe later told OSC that her wrists were held down and her arms were pushed back.
- Roe initially told police she was laying on her side and Doe was laying behind her, and Roe felt like she would have been able to get up or move during the incident. Then, after being asked about force multiple times and told that the law requires some type of force, Roe stated that Doe's body was directly on top of her and his body weight acted as the force.
- Roe told police that after the intercourse she and Doe were cuddling and spooning but later claimed in the OSC hearing that she was in shock and staring at the ceiling.

- Roe told police that "[s]he didn't say anything" during the intercourse, but Roe told investigators that she "repeatedly said 'No'" throughout the encounter.

161.    Roe expressly acknowledged that her account to OSC was informed by what Prosecutor Jones explained to her about the criminal definition of force. Incredibly, the hearing panel chose to accept Roe's characterization of her own contradictions as simply her way of "doing a better job of explaining."

162.    In considering Roe's statement to police that she would have been able to get up or move during the incident, the hearing panel interpreted this inconsistency as "an indication that while [Roe's] hands or forearms may have been held during penile-vaginal penetration, there was not enough information shared about force being applied to demonstrate that [Doe] overpowered or restricted [Roe's] movements." This conclusion is nonsensical. Surely, if Roe was pinned under Doe's body and held down by her wrists as she claimed to OSC, her movement would have been restricted and she never would have told police that she could have stood up or moved.

163.    Nonetheless, the hearing panel stood firmly by the mental gymnastics it performed to avoid discrediting Roe.

164.    The hearing panel found Roe not responsible on the grounds that she did not know or should not have known that Doe was incapacitated.

165.    The hearing panel's decision was inexplicable for multiple reasons. For instance:

i)    By Roe's own account, she was sober, and she thought that Doe should sleep over because he was too drunk to get home after consuming several types of alcohol and drugs throughout the day and night.

ii)    As reported during the investigation, Doe estimated that he had consumed somewhere between 16 and 22 drinks, an amount that would indisputably cause severe incapacitation, particularly when also combined with several different drugs.

iii)    IU's policies were clear that consent could not be obtained by someone who was under this level of intoxication.

iv) IU's policies were also clear that consent does not exist when the individual initiating sexual activity knew or should have known of the other individuals' level of incapacitation.

v) Roe admitted to initiating the sexual activity with Doe, when she knew that he was severely intoxicated and that he was asleep.

vi) Doe's text messages after the fact were taken out of context and misconstrued as admissions of guilt, when they were instead expressions of Doe's embarrassment and self-loathing over his relapse and black out.

vii) Roe failed to produce her SANE examination results, yet the panel nonetheless improperly relied upon the mere fact that she had undergone an exam as proof of her allegations.

viii) Roe continuously changed her account of the events, increasing the severity of Doe's alleged actions over time.

166. The finding also manipulated University policy stating that the one who initiated sexual contact is responsible for obtaining consent. Roe stated that she and Doe "went to sleep" and "the sexual activity began when she leaned over and kissed [Doe]," but —again, inexplicably—the hearing panel found that Doe was the one who initiated sexual contact.

167. This finding is directly contradictory to the University's policy indicating that Roe, as the one who initiated sexual contact, was responsible for obtaining consent from Doe, which she failed to do.

168. The finding also goes against the accounts of Doe and Roe's friend, Witness 1, who described Doe doing drugs and drinking alcohol throughout the day, evening, and early morning of July 4-5, in front of Roe and Witness 1.

169. The hearing panel ignored evidence clearly demonstrating that Doe was incapacitated, as defined by IU's policies, and therefore did not, and could not, consent to sexual interaction.

170.   Upon the hearing panel's deliberations, Doe was expelled from the University. In stark contrast, Roe received no consequences.

C.   *Doe's Appeal*

171.   Doe promptly appealed the hearing outcome on the grounds of procedural irregularity that affected the outcome and disproportionate sanction.

172.   On May 5, 2021, the University's Associate Vice Provost for Student Affairs, Kathy Adams Riester, sent Doe a brusque two-and-a-half-page letter rejecting his appeal.

173.   Riester's rejection was improper because there undoubtedly were procedural irregularities that affected the outcome of Doe's case, as well as disproportionate sanctions imposed on Doe.

### a.   *Procedural Irregularity That Affected the Outcome*

174.   OSC violated a critical procedural right of Doe's as a respondent, which was to be fully informed of the procedures used against him and to have OSC's assistance in understanding those procedures. OSC never provided Doe with any information about the procedures used in either cross-complaint.

175.   IU also violated its polices when it failed to conduct a thorough investigation, by among other things, failing to obtain the crucial evidence of Roe's SANE examination results, which Roe said she would provide.

### b.   *Disproportionate Sanction*

176.   Given the circumstances of this incident, in which Roe admitted to initiating sexual contact with Doe while she was sober and while Doe was asleep and intoxicated, IU's imposition of a sanction of expulsion upon Doe was grossly disproportionate, unwarranted, not supported by the evidence, and unnecessarily punitive based solely upon his status as the male respondent.

177.    The sanction is further unwarranted because of the fact that Roe would have been expelled if all of the agreed-upon facts remained the same, but the genders were reversed. If a sober male student had a drunk female student stay over at his apartment and sleep in his bed, and the male initiated sexual contact with the female while she was half-asleep and incapacitated, the male would unquestionably be punished.

178.    Moreover, there is no evidence corroborating Roe's account. Roe refused to provide the records from the SANE examination she had conducted right after the alleged incident.

179.    Furthermore, the sanction is disproportionate because the hearing panel concluded that Doe did not use physical force.

180.    In comparison, in October 2018, an IU hearing panel determined that an IU football player sexually assaulted a female IU student while she was asleep and used force to continue the assault after the female woke up. The sanction imposed on the football player was a 2.5-year *suspension*.

181.    Thus, there is no justifiable basis for imposing the extraordinary sanction of expulsion in Doe's case.

182.    In light of the problematic facts of Roe soberly facilitating the encounter and repeatedly changing her story, as well as Roe's reluctance to turn over hospital records and the subsequent lack of evidence, this case boiled down to competing narratives. Given these circumstances, Doe's expulsion is grossly unfair, and was evidently informed by gender biased stereotypes and decision-making.

## VII.    Plaintiff's Damages

183.    Due to Defendants' unfair, unlawful and gender-biased conduct, Plaintiff was subject to a flawed, improper, and impartial investigation and adjudication process which failed to

comport with Defendants' promises to Plaintiff as an enrolled student and deprived him of due process.

184.    Due to Defendants' unfair, unlawful and gender-biased conduct, Plaintiff was treated as a perpetrator and presumed guilty from the start, while his assailant walked away with no consequences.

185.    Due to Defendants' unfair, unlawful and gender-biased conduct, Plaintiff was improperly expelled from IU, delaying his education and the start of a career.

186.    Due to Defendants' unfair, unlawful and gender-biased conduct, Plaintiff has been improperly labeled a sexual predator despite the fact that he was a victim of sexual assault.

187.    Due to Defendants' unfair, unlawful and gender-biased conduct, Plaintiff's academic/disciplinary file and transcript are now marred by a false and baseless finding of sexual misconduct and expulsion.

188.    Due to Defendants' unfair, unlawful and gender-biased conduct, Plaintiff will have to disclose to any future educational institution or professional program, licensing authority, or job that he applies to that he was found responsible for committing sexual misconduct, which carries a particularly harmful and overwhelmingly damaging stigma in today's social and political climate.

189.    Due to Defendants' unfair, unlawful and gender-biased conduct, Plaintiff's education and career path have been significantly disrupted, resulting in considerable economic and consequential harm.

190.    Due to Defendants' unfair, unlawful and gender-biased conduct, Plaintiff has suffered and will continue to suffer ridicule, reputational damage, economic losses, and damages to his future educational and career prospects.

**COUNT I**
**Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq.**
**(Against Defendant Indiana University)**

191.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

192.    Title IX of the Education Amendments of 1972 provides, in relevant part, that, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

193.    Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, which includes Defendants the Trustees and IU. *See Marshall v. Indiana Univ.,* 170 F. Supp. 3d 1201, 1210 (S.D. Ind. 2016) (highlighting that "[t]here is no dispute that" Indiana University is "subject to Title IX's prohibition on sex discrimination.")

194.    At public universities such as IU, students who have been accused of sexual misconduct have a right to due process under Title IX. *See* U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (2001) (the "2001 OCR Guidance") at 22; April 2011 Dear Colleague Letter at 12.

195.    Title IX may be violated by a school's imposition of university discipline where gender is a motivating factor in the decision to discipline.

A.    *Erroneous Outcome and Selective Enforcement*

196.    Challenges to university disciplinary proceedings for sex discrimination can fall into two categories: (1) "erroneous outcome" cases, in which the claim is that the plaintiff was

innocent and wrongly found to have committed an offense and gender bias was a motivating factor behind the erroneous findings; and (2) "selective enforcement" cases, in which the claim asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the student's gender.

197.    While some Circuits continue to analyze Title IX claims under either erroneous outcome or selective enforcement theories, the Seventh Circuit in *Doe v. Purdue* did depart from those classifications, saying it "see[s] no need to superimpose doctrinal tests on the [Title IX] statute." *Purdue*, 928 F.3d at 667. Instead, the critical question in examining whether a claim adequately alleges a violation of Title IX is: "do the alleged facts, if true, raise a plausible inference that the university discriminated against John 'on the basis of sex'"? *Doe v. Purdue Univ.,* 928 F.3d 652, 667–68 (7th Cir. 2019). Here, the answer is in the affirmative.

198.    First, the University's finding that Plaintiff was guilty of sexual misconduct was plainly erroneous.

199.    The University maintains that "[t]he person initiating the sexual act is responsible for getting consent." Roe told OSC that she initiated sexual contact by leaning over and kissing Doe while he slept next to her. Inexplicably, against Roe's own account as well as Doe's, the hearing panel found that Doe was the one who initiated sexual contact.

200.    In addition, multiple witnesses told investigators about Doe's excessive drinking and drug use, over a period of more than twelve hours, which was done in front of Roe. Roe also told investigators that she did not think Doe could get back to his own home because he was too drunk. Despite these facts, the hearing panel inexplicably concluded that Roe did not know or should not have known Doe was incapacitated.

201.    The panel also concluded that Roe was not responsible for engaging in sexual acts without Doe's consent, again despite clear evidence conforming his level of incapacitation.

202.    Even more incredibly, the hearing panel found that Doe, while incapacitated, was responsible for engaging in sexual acts without the consent of Roe, the sober initiator.

203.    Further, rather than using Doe's severe intoxication as an indication that he could not consent to sexual contact and was in no state to initiate such activity while exhausted, imbalanced, nauseous, and half-asleep, the panel chose to fault Doe for his "inability to connect the impact of his alcohol and drug use to the occurrence of the non-consensual sexual behavior."

204.    Each of the foregoing demonstrates that the finding reached against Doe was unsupported by the evidence and was instead the result of discrimination against him on the basis of his gender.

205.    The foregoing demonstrates how IU's partiality toward Roe as the female accuser, and against Doe as the male accused, led to the erroneous finding that has extinguished Doe's ability to participate in and benefit from IU's educational program.

206.    In January 2020, NASPA, the national organization of Student Affairs Administrators in Higher Education, which has 15,000 members representing more than 1,500 institutions, issued a study, *Expanding The Frame: Institutional Responses to Students Accused of Sexual Misconduct.*" The study, intended to refute "the common narrative that institutions are not concerned with responding parties' rights in sexual misconduct cases," essentially evidenced to the contrary that widespread institutional bias against the accused starts at the very inception of a complaint, prior to any investigation or adjudication. In a process governed by the enforcement of Title IX gender equality, and in which the overwhelming majority of accused students are male, the survey reported that only five percent (5%) of schools have even one full-time employee to

assist accused students; eighty-five percent (85%) have no budget dedicated specifically to providing services for accused students; and for accused students "no established best practices currently exist, and most institutions are only just developing these programs, identifying what specific services are needed, and exploring what is equitable or equal." While alleged victims have entire departments of advocates funded by the institution dedicated to their needs, only 13% of colleges and universities have a staff member reach out "directly to responding parties about support services available." The study suggests that accused students are left to defend themselves by administrators "due to perceived pushback from members of the campus community who disagree with providing respondent services."

207.    IU also faced additional pressure to vindicate female complainants against male respondents because of embarrassing public attention drawn to the school's past failings.

208.    In September 2020, a photo of a female IU student's sexual assault was shared throughout social media, sparking rage and protest on campus.

209.    The pressure on the University to vindicate female students alleging violations of the Policy in any manner caused the University to subject Plaintiff to a biased and unfair process, which was tilted in favor of the female complaint and against the male respondent.

210.    A university that is driven to take adverse action against an accused male in order to respond to, or protect itself from, negative publicity about sexual harassment is motivated by gender bias and engages in unlawful sex discrimination under Title IX. *See Doe v. Columbia Univ.,* 831 F.3d 46, 58 (2d. Cir. 2016) (stating that "fear of negative publicity or of Title IX liability[] are not necessarily . . . lawful motivations distinct from sex bias," and that an institution which "adopts, even temporarily, a policy of bias favoring one sex over the other in a disciplinary dispute . . . in

order to avoid . . . bad publicity[] has practiced sex discrimination, notwithstanding that the motive for the discrimination did not come from ingrained or permanent bias against that particular sex").

211.    The University utilized the Policy to treat Doe, an accused male, differently from Roe, by aggressively disciplining Doe while wholly ignoring the misconduct of Roe.

212.    These actions were designed to find Doe responsible for sexual misconduct and severely punish him for it.

213.    IU officials possessed the authority to stop this wrongdoing. By doing nothing, they were deliberately indifferent to Doe and similarly situated male students reporting sexual misconduct or facing similar charges under the Policy.

214.    Based on the foregoing, Plaintiff was subjected to a biased and unfair process, in violation of Title IX, designed to find him responsible for sexual misconduct and to improperly and severely punish him for it.

215.    This unlawful discrimination in violation of Title IX proximately caused Doe to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish, severe emotional distress, injury to reputation, past and future economic loss, deprivation of due process, loss of educational opportunities, and loss of future employment prospects.

216.    As a result of the foregoing, Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT II
### 42 U.S.C. §1983: Denial of Fourteenth Amendment Procedural Due Process
(Against All Defendants)

217.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

218.    The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." A similar right is stated in the Fifth Amendment to the United States Constitution.

219.    Section 1983 of Title 42 of the U.S. Code provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

220.    The Due Process Clause applies where "charges of misconduct" by school authorities and a suspension "could seriously damage the students' standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment." *Goss v. Lopez*, 419 U.S. 565, 575 (1975).

221.    A person has a protected liberty interest in his good name, reputation, honor, and integrity, of which he cannot be deprived without due process. The Due Process Clause "forbids arbitrary deprivations of liberty," such that "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, the minimal requirements of the Clause must be satisfied." *Id.* at 574 (internal quotations omitted).

222.    Deprivation of the protected liberty interest, identified by the "stigma-plus" test, occurs where, as here, the State inflicted reputational damage accompanied by an alteration in legal status that deprived the person of a right he previously held. *See Doe v. Purdue Univ.*, 928 F.3d 652, 661 (7th Cir. 2019) (highlighting that a liberty interest is protected upon satisfaction of the "stigma plus" test).

223.    Here, the resulting expulsion changed Plaintiff's legal status as he could no longer be a student, put his reputation and honor at stake, and seriously damaged his career prospects. Plaintiff is thus entitled to procedural protections under the Due Process Clause. *See Doe v. Purdue Univ.*, 928 F.3d at 663 (7th Cir. 2019) (finding that plaintiff who was suspended for one year after University found him guilty of sexual violence had adequately alleged a liberty interest under the "stigma plus" test because he alleged reputational harm, a change to his legal status due to the suspension).

224.    Doe satisfies this test because Defendants inflicted reputational harm by wrongfully branding him a perpetrator of sexual assault and then changing Doe's legal status by expelling him from IU without a thorough investigation or impartial hearing.

225.    Defendants will further inflict reputational damage as it will disclose to any third-party inquirer, including other institutions, graduate schools, and employers, that Doe was expelled from IU due to sexual misconduct. This inevitable disclosure constitutes the state inflicted reputational harm component of the stigma-plus test.

226.    Doe's reputational damage has impacted him immensely and will continue to impact him for the rest of his life. Doe is already ostracized from his peers and colleagues. As time passes, he will continue to suffer further.

227.    Doe's protected interest in an impartial proceeding – which the University failed to provide – directly caused this reputational damage.

228.    A person also has a protected property interest in pursuing his education, as well as in future educational and employment opportunities and occupational liberty, of which he cannot be deprived without due process.

229.    In higher education, a "property interest is a matter of contract between the student and the university." *See Doe v. Purdue*, 928 F.3d at 660; *see also Bissessur v. Ind. Univ. Bd. of Trs.,* 581 F.3d 599, 601 (7th Cir. 2009) (noting that the "basic legal relation between a student and a private university or college is contractual in nature" and that the University stole from the student "the right to a continuing education or the right not to be suspended without good cause.")

230.    Prior to his sanction and ultimate expulsion, Plaintiff was a student in good standing at the University. His constitutionally protected property interest in his continued enrollment at IU and freedom from arbitrary expulsion arises from the policies, courses of conduct, practices and understandings established by the University, including the Policy on Discrimination, Harassment, and Sexual Misconduct.

231.    Plaintiff's constitutionally protected property interest further arises from the express and implied contractual relationship between the University and Plaintiff.

232.    Plaintiff applied to and enrolled at IU, and paid associated fees and expenses. He did so in reliance on the understanding, and with the reasonable expectation, that the University would implement and enforce the provisions and policies set forth in its official publications, including the Policy.

233.    As a relationship between a student and a university is contractual in nature, Doe thus entered into a contract with the University through the aforementioned facts, entitling him to due process protections. *See Doe v. Purdue*, 928 F.3d at 661.

234.    The Policy states that when someone reports "discrimination, harassment, and/or sexual misconduct," a designated IU official will promptly reach out to the Complainant and "offer to meet and provide written information about . . . [p]otentially applicable university procedures,

including to whom and how a formal complaint can be filed, as well as the individual's rights and options within the university proceedings . . . ."

235.    The Policy states that throughout the complaint resolution process, both parties have the right "[t]o be fully informed of university policies and procedures, as well as the nature and extent of all alleged violations within the allegation."

236.    The Policy also provides that both parties have the right "[t]o be treated with respect."

237.    Moreover, the Policy states that both parties have the right to "adequate, reliable, and impartial investigation and appropriate resolution of all complaints of discrimination, harassment and/or sexual misconduct."

238.    The University provides that students are entitled to a fair and impartial disciplinary process in which it is IU's responsibility to show that a violation occurred before any sanctions are imposed.

239.    The University uses a preponderance of the evidence standard, meaning more likely than not, to determine responsibility.

240.    The Policy explains that

>    [t]he investigation may include, but is not limited to interviews with the Complainant, the Respondent, and other witnesses identified as having information relevant to the allegations made, as well as the examination of written statements by the parties, ***relevant documents***, and ***other relevant information***. Information for the investigation may be provided by Complainants, Respondents, witnesses identified by any party, or the [U]niversity. Any individual believed to have information relevant to an investigation may be contacted and requested to make an appointment to discuss the matter.

(Emphasis added).

241.    The Policy provides that both parties have the right "[t]o have appeal rights as afforded under the applicable complaint resolution procedures."

242.    Defendants breached their express and/or implied contracts with Doe and denied him clearly established rights under the Due Process Clause of the Fourteenth Amendment by failing to provide Doe with a process commensurate with the seriousness of the allegations, sanctions, and repercussions he was facing.

243.    The United States Department of Education's Office for Civil Rights has also acknowledged that public universities are required to provide constitutional due process protections to students accused of sexual misconduct. This was reiterated in the April 2011 Dear Colleague Letter which stated that "[p]ublic and state supported schools *must* provide due process to the alleged perpetrator" in sexual misconduct cases. *Dear Colleague Letter* at p. 12.

244.    The allegations against Plaintiff resulted in his expulsion from college and a permanent mark on his record, which will impose lifelong damage with respect to his education, employment, and reputation.

245.    Defendants violated Plaintiff's clearly established rights under the Due Process Clause of the Fourteenth Amendment through their deprivation of the minimal requirements of procedural fairness by, without limitation:

      i)      Failing to notify Doe of the precise University policies applicable to his case;

      ii)     Depriving Doe of impartial decision-makers, when the hearing panel members accepted Roe's allegations at face value;

      iii)    Depriving Doe of an opportunity to cross-examine his accuser at the hearing;

      iv)    Ignoring clear evidence tending to dispute Roe's credibility including her continuously evolving narrative, witness statements confirming Doe's level

of incapacitation, Roe's failure to provide copies of her SANE examination records, and evidence that Roe initiated the sexual encounter with Doe; and

v)    Imposing a severely unwarranted sanction upon Doe, while failing to impose any sanction on Roe despite her actions which clearly violated IU's policies.

245.    Defendants deprived Doe of his liberty and property interests without affording him basic due process, including, but not limited to, his right to a fair adjudication free from bias, his right to be fully informed of the procedures applied to his case, his right to be innocent until proven responsible and not be subjected to the burden of proving his innocence, his right to be heard by a competent and impartial fact finder, and his right to appeal under the applicable complaint resolution procedures. Doe will suffer lifelong damages as a result of the University's findings and sanction.

246.    In attempting to demonstrate their vigorous compliance with the April 2011 Dear Colleague Letter, Defendants subjected Doe to an insufficient process by failing to provide him a reasonable opportunity to defend himself, instead arriving at an arbitrary, predetermined, and unwarranted decision motivated by gender bias.

247.    As a result, Defendants failed to provide Doe with basic due process protections that they are required to provide students subjected to the disciplinary process at a public institution.

248.    Defendants Riester and Williams, as well as other agents, representatives, and employees of the University, were acting under color of state law when they showed intentional, outrageous, and reckless disregard for Plaintiff's due process rights. Defendants all agreed to, approved, and ratified this unconstitutional conduct.

249.    Defendants Trustees and IU, as well as other agents, representatives, and employees of the University deprived Plaintiff of the requisite due process because the University had a

pecuniary interest in the outcome of the adjudication. Had Plaintiff been found not responsible, the University risked facing campus unrest, negative media coverage, and intense scrutiny from students, parents, alumni, and the general public.

250.    Chairperson Williams, in her official capacity and ex officio capacity, was responsible for implementing the Policy and carrying out IU's processes in an unbiased and impartial manner. She failed to do so when she led a hearing in which Doe was treated as the perpetrator respondent while Roe was treated as the victim complainant.

251.    Dr. Riester failed to uphold her responsibilities as Associate Vice Provost for Student Affairs and Executive Associate Dean of Students for the Division of Student Affairs at IU. Dr. Riester is responsible for overseeing every facet of student life, including IU's compliance with federal and state laws, but she allowed the biased and flawed proceedings against Doe to occur and then upheld his wrongful expulsion.

252.    As a result of these due process violations, Plaintiff suffered and will continue to suffer ongoing economic and non-economic damages and significant reputational damage.

253.    Accordingly, Defendants are liable to Plaintiff for violations of 42 U.S.C. § 1983 for violations of the Due Process Clause of the Fourteenth Amendment and for all damages arising therefrom.

254.    As a direct and proximate result of the foregoing, Plaintiff sustained damages including, without limitation, emotional distress, loss of educational opportunities, loss of career opportunities, economic injuries, and other direct and consequential damages.

255.    Plaintiff further seeks punitive damages against Defendants.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff John Doe demands judgment against

Defendants as follows:

(i)    On the first cause of action for violation of Title IX of the Education Amendments of 1972: erroneous outcome, a judgment awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing IU to: (a) reverse the outcome, findings, and sanction regarding Roe's complaint; (b) expunge Plaintiff's disciplinary record with respect to the Roe matter; (c) remove any record of the Roe finding or Plaintiff's expulsion from his educational file/disciplinary records/transcript; and (d) any and all further actions required to return Plaintiff to the status quo ante;

(ii)   On the second cause of action for violation of Title IX of the Education Amendments of 1972: selective enforcement, a judgment awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing IU to: (a) reverse the outcome, findings, and sanction regarding Roe's complaint; (b) expunge Plaintiff's disciplinary record with respect to the Roe matter; (c) remove any record of the Roe finding or Plaintiff's expulsion from his educational file/disciplinary records/transcript; (d) any and all further actions required to return Plaintiff to the status quo ante;

(iii)  On the third cause of action for a violation of 42 U.S.C. § 1983 procedural due process, a judgment awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing IU to: (a) reverse the outcome, findings, and sanction regarding Roe's complaint; (b) expunge Plaintiff's disciplinary record with respect to the Roe matter; (c) remove any record of the Roe finding or Plaintiff's expulsion from his educational file/disciplinary records/transcript; and (d) any and all further actions required to return Plaintiff to the status quo ante; and

(iv)   Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff herein demands a trial by jury of all triable issues in the present matter.

Dated:  New York, New York
        April 11, 2023

Respectfully submitted,

NESENOFF & MILTENBERG, LLP
*Attorneys for Plaintiff John Doe*
By: _____*Tara J. Davis*_____
Andrew T. Miltenberg, Esq.
Tara J. Davis, Esq.
363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500
amiltenberg@nmllplaw.com
tdavis@nmllplaw.com

DELK MCNALLY LLP
*Attorney for Plaintiff John Doe*
By:*/s/ Michael T. McNally*
Michael T. McNally, Att. No. 23676-49
610 N. Rangeline Rd.
Carmel, IN 46033
(317) 442-4444
mcnally@delkmcnally.com