## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | |
|---|---|
| **JOHN DOE,** | |
| *Plaintiff,* | **Civil Action No: 1:23-cv-00643-SEB-MG** |
| **-vs.-** | |
| **INDIANA UNIVERSITY BLOOMINGTON, INDIANA UNIVERSITY BOARD OF TRUSTEES, KATHY ADAMS RIESTER, in her individual and official capacity, and LATOSHA WILLIAMS, in her individual and official capacity,** | |
| *Defendants.* | |

### PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COUNT II- CLAIMS ASSERTED UNDER 42 U.S.C. § 1983

Plaintiff John Doe ("Plaintiff" or "Doe") submits this opposition to Defendants' Motion to Dismiss Count II of his Complaint, as to all claims asserted under 42 U.S.C. § 1983.

### Relevant Factual Background

The complete facts underlying this litigation are fully set forth in Plaintiff's Complaint [ECF No. 1] and are incorporated herein by reference. For the Court's convenience, a summary of the relevant facts follows.

Doe enrolled at IU in fall 2018. Cmplt. ¶ 99. On July 4, 2020, the off-campus fraternity house in which Doe lived hosted a Fourth of July party together with the house next door. By the time alumni began arriving at around noon, Doe had already started drinking. Over the next several hours, Doe caught up with friends, played beer pong, and did a line of cocaine. Cmplt. ¶ 103.

At around 4:00 p.m., Doe saw Witness 2, Doe's friend and a former IU student, together with Roe and her friend, Witness 1, neither of whom Doe had met before. Doe introduced himself to Roe and Witness 1. Doe, Roe, Witness 1, and Witness 2 hung out together at the party. Cmplt. ¶ 104. At around 5:00 p.m., the four of them went to Doe's room, where they all listened to music, drank shots of vodka, and Doe and Witness 2 smoked marijuana. Before they all left Doe's room at around 10:00 p.m., Doe took one Valium pill. Cmplt. ¶ 105.

The group then went outside and watched a bonfire from the roof of Doe's fraternity house, hanging out among other students and alumni on the roof. At around 12:00 a.m., Witness 3, an alumni and Doe's former fraternity brother, arrived and tried to talk the group into going to a local strip club called Night Moves. Cmplt. ¶ 106. Doe said he did not want to go to Night Moves, but Roe, Witness 1, and Witness 3 all wanted to go and encouraged Doe to join them. At around 1:15 a.m., Doe agreed to go with them, and Witness 3 called an Uber that drove Doe, Roe, Witness 1, and Witness 3 to Night Moves. Cmplt. ¶ 107.

When the group arrived at Night Moves, the bouncer refused to let in Doe, Roe, and Witness 1 because they were underage. Doe then requested a Lyft to pick the three of them up. While they waited for the Lyft, Doe took half of a Valium pill. Cmplt. ¶ 108. Roe was aware of Doe's Valium intake throughout the evening because he had talked about it. Doe also recalled a discussion in his room between himself, Roe, Witness 1, and Witness 2, in which Witness 1 who worked at a pharmacy, cautioned that taking Valium while drinking alcohol can enhance the effects of each substance and "fuck you up." Cmplt. ¶ 109.

Doe tried to set two stops on the Lyft ride so he could get dropped off separately from Roe and Witness 1, but he was unable to do so. Doe, Roe, and Witness 1 all got dropped off at Roe's apartment at around 2:00 a.m. Cmplt. ¶ 110. When Doe, Roe, and Witness 1 arrived at Roe's

apartment, Witness 1 offered Doe white wine and Smirnoff Ice, both of which Doe drank. The three watched a movie and shared a frozen pizza. Cmplt. ¶ 111. At some point, Doe asked Roe if he could stay over because his phone battery was dead and he felt too intoxicated to get home. Roe said yes. At around 4:00 a.m., after checking with Roe that she was okay being left alone with Doe, Witness 1 left Roe's apartment. Cmplt. ¶ 112.

Doe's memory of what happened thereafter is blurry, but he recalled that Roe took a shower, and afterward Doe asked if he could take a shower. Before getting in the shower, Doe took another half of a Valium pill. He was exhausted, unbalanced, and extremely intoxicated by that point. Cmplt. ¶ 113. After Doe took a shower, he asked Roe where he should sleep, whether on the floor or downstairs. Roe asked Doe if he wanted to sleep in her bed, and Doe laid down in her bed. Doe remembered feeling extremely dizzy when he closed his eyes and trying not to throw up. Shortly thereafter, Doe passed out. Cmplt. ¶ 114.

At some point, Doe awoke to Roe talking to him and playing with his hair. Cmplt. ¶ 115. Roe leaned over and began kissing Doe and undressing herself. Doe did not remember kissing Roe back. Cmplt. ¶ 116. Roe then told Doe she wanted him to perform oral sex on her. Doe asked if she was sure, Roe said yes, and Doe performed oral sex. Roe ended the oral sex by grabbing Doe under his arms and pulling him toward her so that he moved on top of her. Cmplt. ¶ 117. Once Doe was on top of Roe, she grabbed his penis out of his boxers and began rubbing it against her vagina. Doe was taken aback by this because he was not wearing a condom, which concerned him. Doe also did not want to have sex with someone whom he had just met, as he knew nothing about her sexual health or history. Cmplt. ¶ 118.

Doe's memory of what happened afterward is spotty and incomplete, but he believed the two had sexual intercourse even though Doe did not, and could not, consent due to his condition

and level of extreme intoxication. Doe could not remember his penis penetrating Roe's vagina, but he remembered ejaculating. Cmplt. ¶ 119. Doe remembered Roe lying next to him after intercourse and asking what would happen between Doe and his ex-girlfriend. Doe said that he did not know. Roe then said, "I hope I don't get too attached to you." Doe responded, "Why would you? We just met." Cmplt. ¶ 120. Doe fell back asleep, and upon waking up at around 11:30 a.m., Doe panicked. He had blacked out, his phone was dead, he was not sure where he was, and neither Roe nor anyone else was around. Cmplt. ¶ 121. Doe found a charger so he could power on his phone, then immediately called his mother, told her that he relapsed and was ashamed of himself, apologized to her, and said he was alone in a strange apartment and did not know where he was. Cmplt. ¶ 122. After speaking with his mother, Doe called and texted Roe a few times to ask where she was and what happened the night before. Doe then left Roe's apartment and returned home. Cmplt. ¶ 123.

On July 5, 2020 at around 1:00 p.m., Witness 1 messaged Doe on Instagram and told him that Roe had gone to the hospital because she felt she was sexually assaulted. This completely shocked Doe, who could not comprehend why Roe would say anything like that.[1] Cmplt. ¶ 122. Doe replied, "There is no way. I couldn't have." He panicked again, sending a series of unanswered messages and telling Witness 1 he could not remember what happened due to his incapacitation from drugs and alcohol. Cmplt. ¶ 123. On July 16, Roe texted Doe a picture from July 4 of him in his room and said, "I do wish I would've gotten to know you." Cmplt. ¶ 129.

On September 14, 2020, Roe contacted the Bloomington Police Department. Roe was interviewed by Bloomington Police Detective Chris Scott, while Hannah Jones, the Monroe County Prosecutor, took notes. Cmplt. ¶ 130. Upon hearing Roe's account, Detective Scott asked

---

[1] Importantly, Witness 1 later told the investigator that she had not spoken with Roe in detail about what Roe alleged to have happened that evening.

whether Doe pulled Roe's arms back or used any force. Roe said that she did not remember if Doe was holding her arms, but it was "kind of like cuddling a little." Roe stated that she was lying on her side and Doe was behind her, like "spooning." Cmplt. ¶ 131. Detective Scott asked Roe if she felt like she could have gotten up or moved away without Doe stopping her, and Roe said, "yeah maybe." Detective Scott told Roe that a sexual assault, by legal definition, required some type of force. Cmplt. ¶ 132. Detective Scott and Prosecutor Jones then informed Roe that the requisite element of force was missing, so they could not file a sexual assault charge. Prosecutor Jones explained to Roe what force looks like under Indiana law and that penetration by itself does not constitute force. Cmplt. ¶ 133.

After Roe's interview on September 14, 2020, the Bloomington Police contacted Doe and asked him to come in for a meeting. Doe told the police that he could not go in for a meeting because he was no longer in Bloomington. The police accepted this and never contacted Doe again. Cmplt. ¶ 134.

On September 14, 2020, the same day the Bloomington Police Department declined to move forward with Roe's allegations, Roe filed a report with IU. This time, Roe's account was revised to now include a description of force, which Roe understood was required to meet the legal definition of sexual assault in Indiana. Cmplt. ¶ 135. On September 23, 2020, Roe and her advisor Samantha Hammett met via video conference with two members of the IU Office of Student Conduct ("OSC"): Taylor Struble, Sexual Misconduct Investigator, and Laura Mals, Associate Director. Roe told Struble and Mals that Doe held her arms down by her head, with his hands wrapped around her forearms, and pushed her arms back against her bed. Cmplt. ¶ 136.

On October 20, 2020, nearly one month later, OSC notified Doe of the allegation that he violated the Sexual Misconduct Policy by sexually harassing and/or assaulting Roe by force and

5

without her consent. OSC stated that Doe allegedly vaginally penetrated Roe with his penis without a condom after she repeatedly said "no," and held Roe down by her wrists while doing so. Cmplt. ¶ 137. On November 13, 2020, Doe submitted a written statement to OSC in response to Roe's complaint. Upon reflection, in preparing his statement and repeatedly reliving memories of that night with Roe, Doe came to recognize the fact that he was the one who had been sexually assaulted by Roe. Thus, along with his written statement, Doe filed a complaint reporting that Roe kissed him, fondled his penis, and penetrated her vagina with his penis, without a condom, while Doe was incapacitated and without Doe's consent. Cmplt. ¶ 138.

On March 18, 2021, Doe received a letter from Libby Spotts, Associate Dean of Students, notifying him that "based on the content of [Roe's October 20, 2020] report," Doe was being charged with sexual harassment and/or sexual assault without consent and/or by force, in violation of the University's policies. Cmplt. ¶ 143. The March 18, 2021 notice advised Doe that Roe was also being charged with a violation of the Sexual Misconduct Policy, but did not describe the precise actions of Roe that were under investigation. Cmplt. ¶ 144. The notice further indicated that a hearing for the charges against both parties would take place merely one week later, on March 25, 2021. Cmplt. ¶ 145.

On March 25, 2021, the University held a sexual misconduct hearing for the charges against Doe and Roe. Cmplt. ¶ 147. During the hearing, Roe altered her account yet again, claiming that Doe held her legs apart with his hands. The panel failed to ask Roe any questions about this new detail that was raised for the first time during the hearing. Cmplt. ¶ 151. Roe also alleged for the first time during the hearing that after intercourse, she laid on her back while staring at the ceiling and telling herself not to cry. Cmplt. ¶ 152. Regarding the inconsistencies in her accounts to Bloomington Police and OSC, Roe claimed that "because the prosecutor informed her that what

she had originally shared would not meet the criminal definition for restraint or confinement, she was trying to do a better job of explaining what occurred to the OSC investigators." Cmplt. ¶ 154. The panel never asked Roe why she declined to disclose the results of her SANE examination during the investigation. Cmplt. ¶ 158. The panel also failed to contact Detective Scott and Prosecutor Jones to serve as witnesses during the hearing, although they were the people who took Roe's initial statement regarding the encounter, as their testimony would have raised doubt regarding the veracity of Roe's claims. Cmplt. ¶ 159. Throughout the hearing, the panel addressed Roe in a gentle, coddling tone and responded supportively to everything she said. Williams, the Chair of the hearing panel, sounded nervous when addressing Roe, stammering, stumbling over her words, and pausing frequently. Cmplt. ¶ 155. In contrast, Williams' tone was clear and authoritative when she spoke to Doe, and she and the other panel members frequently addressed Doe in a critical and disparaging manner. By way of example, Williams snickered while reading aloud one of Doe's previous statements about the sexual contact. Cmplt. ¶ 156.

On April 14, 2021, OSC sent Doe a letter notifying him of the hearing outcome. The letter read: "You have been found responsible for sexual harassment and sexual assault without consent and by force. You have been found responsible for vaginally penetrating [Roe] with your penis without a condom after she repeatedly said "No" and told you that she did not want to engage in penile-vaginal penetration, and for engaging in force by coercion." Cmplt. ¶ 160. The hearing panel found Roe not responsible on the grounds that she did not know or should not have known that Doe was incapacitated. Cmplt. ¶ 164. Upon the hearing panel's deliberations, Doe was expelled from the University. In stark contrast, Roe received no consequences. Cmplt. ¶ 170.

Doe promptly appealed the hearing outcome on the grounds of procedural irregularity that affected the outcome and disproportionate sanction. Cmplt. ¶ 171. On May 5, 2021, the

University's Associate Vice Provost for Student Affairs, Kathy Adams Riester, sent Doe a brusque two-and-a-half-page letter rejecting his appeal. Cmplt. ¶ 172.

**Legal Standards**

**I.     Motion to Dismiss Under 12(b)(1)**

As recently stated by this Court, "[a] court ruling on a Rule 12(b)(1) motion to dismiss must accept as true all well-pleaded factual allegations and draw reasonable inferences in favor of the plaintiff. *Capitol Leasing Co. v. F.D.I.C.,* 999 F.2d 188, 191 (7th Cir. 1993). "However, where a party raises a factual question concerning jurisdiction, the district court is not bound to accept as true the allegations of the complaint which tend to establish jurisdiction." *Grafon Corp. v. Hauserman,* 602 F.2d 781, 783 (7th Cir. 1979). In such circumstances, the district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted to determine whether subject matter jurisdiction exists. *Id.* The burden of proof to demonstrate subject matter jurisdiction is on the party asserting jurisdiction. *United Phosphorus, Ltd. v. Angus Chem. Co.,* 322 F.3d 942, 946 (7th Cir. 2003). *Barker v. Kapsch Trafficcom USA, Inc.,* No. 119CV00987TWPMJD, 2020 WL 2832092, at *3 (S.D. Ind. June 1, 2020).

**II.    Motion to Dismiss Under 12(b)(6)**

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff does not have to plead evidence or prove his claims, but rather, just allege "enough facts to state a claim that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A Rule 12(b)(6) motion "tests the sufficiency of a complaint; importantly, it does *not* resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N. Carolina v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (emphasis added). *See also Xechem, Inc.*

*v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004) ("[P]laintiffs need not anticipate and attempt to plead around all potential defenses.").

When reviewing a motion to dismiss, a court does not have to credit "a legal conclusion couched as a factual allegation" (*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); however, it *must* otherwise accept all fact allegations as true and draw all reasonable inferences from the facts in favor of the plaintiff. *Gociman v. Loyola Univ. of Chicago,* 41 F.4th 873, 881 (7th Cir. 2022). Accordingly, "when there are [multiple] equally plausible ways to read a complaint, we should adopt the reading that is most favorable to [the plaintiff]." *Worthy v. City of Phenix, Ala.,* 930 F.3d 1206, 1214 (11th Cir. 2019).

The Supreme Court has expressly warned that notice-pleading "does *not* impose a probability requirement at the pleading stage." *Twombly*, 550 U.S. at 556 (emphasis added). To the contrary, a complaint must be allowed to proceed "even if it strikes a savvy judge that actual proof of [the alleged] facts is improbable, and that a recovery is very remote and unlikely." *Ibid*. Ultimately, "[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S. Ct. 2229, 2232, 81 L. Ed. 2d 59 (1984).

<u>**Argument**</u>

## I. Defendants Are Not Entitled to Immunity Because Plaintiff Requests Prospective Injunctive Relief Against Appropriate Officials Pursuant to 42 U.S.C. § 1983.

Generally, the Eleventh Amendment provides immunity from liability for § 1983 claims seeking damages from state officials acting in their official capacity. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102, 104 S. Ct. 900, 909, 79 L. Ed. 2d 67 (1984). However, it is well established that "[t]he immunity afforded to states by the Eleventh Amendment . . . is not absolute." *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 670, 119 S. Ct.

2219, 2223, 144 L. Ed. 2d 605 (1999). Instead, immunity may be abrogated when: (1) Congress exercises its power under the Fourteenth Amendment and authorizes private suits against unconsenting states (*see Fitzpatrick v. Bitzer*, 427 U.S. 445, 456, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976)); or (2) when a state waives its immunity from suit. *See Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 238, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985); *Marie O. v. Edgar*, 131 F.3d 610, 615 (7th Cir.1997).

Additionally, the Supreme Court has established an exemption from such immunity where a plaintiff seeks prospective injunctive relief to remedy an ongoing violation. *Ex Parte Young*, 209 U.S. 123 (1908). Specifically, where a § 1983 plaintiff seeks prospective injunctive relief, he is entitled to sue a state official who can enjoin ongoing violations of federal law, in their official capacity, pursuant to the *Ex Parte Young* doctrine. *See, e.g., Ex parte Young*, 209 U.S. at 159–60, 28 S.Ct. 441; *Dean Foods Co. v. Brancel*, 187 F.3d 609, 613 (7th Cir.1999); *MCI Telecommunications Corp. v. Illinois Bell Tel. Co.,* 222 F.3d 323, 337 (7th Cir. 2000). In determining whether *Ex parte Young* prevents an Eleventh Amendment bar to suit, "a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Maryland, Inc. v. Public Serv. Commission of Maryland*, 535 U.S. 635, 645 (2002) (quotation marks and citations omitted). Accordingly, Defendants' Eleventh Amendment immunity argument fails because Plaintiff is seeking prospective injunctive relief against appropriate officials in their official capacities.

The cases cited by Defendants do not hold otherwise. For instance, in *Haynes v. Indiana University,* the Plaintiff brought a Title VII and § 1981 claim against Indiana University, alleging that the University's decision to deny him tenure was due to racial discrimination. In affirming the

district court's granting of the University's motion for summary judgment, the Seventh Circuit held that the Title VII claim should be dismissed due to untimely filing with the EEOC. With respect to the § 1981 claim, the court held "[t]he University and its Board of Trustees are state agencies for sovereign-immunity purposes, so Haynes cannot maintain an action for ***damages*** against them." *Haynes v. Indiana Univ.,* 902 F.3d 724, 731 (7th Cir. 2018) (emphasis supplied). While the plaintiff's racial discrimination claim did not proceed due to a lack of evidence, the court conclusively stated "[e]veryone agrees that the claim for injunctive relief can proceed against the official-capacity defendants." *Id. See also Thomas v. Illinois*, 697 F.3d 612, 614 (7th Cir. 2012) ("The plaintiff could have avoided both the statutory and the constitutional bar [Eleventh Amendment immunity] by naming individuals as defendants rather than just a state and an agency of the state, but he failed to do that."); *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 276–77, 117 S. Ct. 2028, 2038, 138 L. Ed. 2d 438 (1997) ("Our precedents do teach us, nevertheless, that where prospective relief is sought against individual state officers in a federal forum based on a federal right, the Eleventh Amendment, in most cases, is not a bar. Indeed, since *Edelman* (*Edelman v. Jordan,* 415 U.S. 651, 94 S. Ct. 1347, 39 L. Ed. 2d 662 (1974)) we have consistently allowed suits seeking prospective injunctive relief based on federal violations to proceed.") (internal citations omitted).[2]

As described in his Complaint, Plaintiff seeks injunctive relief requiring IU to: (a) reverse the outcome, findings, and sanction regarding Roe's complaint; (b) expunge Plaintiff's disciplinary

---

[2] Even if this court were to find that the Eleventh Amendment bars Plaintiff's § 1983 claim (which it should not), the proper remedy is not a dismissal *on the merits* with prejudice, as Defendant's contend. *See McHugh v. Illinois Dep't of Transportation*, 55 F.4th 529, 534 (7th Cir. 2022), *abrogating Mutter v. Rodriguez* (700 F. App'x 528, 531 (7th Cir. 2017)) ("A federal court cannot enter judgment on the merits when Eleventh Amendment immunity applies. *Mutter* and *Cooper* were therefore wrong to modify these judgments to dismissals with prejudice.") (internal citations omitted).

record; (c) remove any record of the Roe finding or Plaintiff's expulsion from his records/transcript; and (d) any other actions to return Plaintiff to the status quo ante. Cmplt. p. 49. The relief requested constitutes prospective injunctive relief, for purposes of *Ex parte Young. See Doe v. Purdue Univ.*, 928 F.3d 652, 666-67 (7th Cir. 2019) (holding that a student found guilty of sexual assault through procedures allegedly violating due process could sue for an "injunction ordering university officials to expunge the finding of guilt from his disciplinary record"). In fact, several other circuits have held that a request to revise disciplinary records is prospective injunctive relief and is not barred by the Eleventh Amendment. *See Doe v. Cummins*, 662 F. App'x 437, 444 (6th Cir. 2016) ("Because Doe I and Doe II are seeking prospective equitable relief, their claims are not barred by the Eleventh Amendment.... If successful, ... the individual defendants would merely be compelled to remove the negative notation from appellants' disciplinary records that resulted from the allegedly unconstitutional disciplinary process."); *Flint v. Dennison*, 488 F.3d 816, 825 (9th Cir. 2007) (finding that negative entries in a student's university records presented a continuing violation sufficient to overcome Eleventh Amendment immunity); *Shepard v. Irving*, 77 F. App'x 615, 620 (4th Cir. 2003) (finding that a request to expunge a grade from a student's record is not barred by the Eleventh Amendment). "These Circuits reason that the relief sought in the disciplinary context is not limited merely to past violations; rather, the injunctions serve the purpose of preventing present and future harm to the plaintiff." *Doe v. Coll. of New Jersey*, 2023 WL 2812362, at *5 (D.N.J. Apr. 6, 2023); *see also Flint*, 488 F.3d at 825.

## II.    Plaintiff May Pursue an Action Against the Individual Defendants in Their Official Capacities Pursuant to § 1983.

Given the clear application of the *Ex parte Young* doctrine to the instant matter, Plaintiff should be permitted to pursue his § 1983 claims against the individual defendants named in their official capacities- Kathy Adams Riester and Latosha Williams. This Court need not determine

whether Defendants Riester and Williams are properly considered "persons" within the meaning of 42 U.S.C. § 1983, as it is well established that *Ex parte Young* permits a private party to pursue an action against individuals named in their official capacities for prospective injunctive relief.[3] Specifically, "*Ex Parte Young*, 209 U.S. 123 (1908), provides an avenue for prospective injunctive relief against officials sued in their official capacities as an exception to the Eleventh Amendment's general bar on bringing claims against states and state officials." *Doe v. Purdue Univ.,* No. 4:19-CV-84-JVB-JEM, 2020 WL 5530095, at *4 (N.D. Ind. Sept. 15, 2020), *citing Seminole Tribe of Fla v. Florida*, 517 U.S. 44, (1996). "Thus, this claim is an *Ex Parte Young* claim and not a § 1983 claim." *Doe v. Purdue Univ.,* 2020 WL at *4.

III.     **The Complaint Pleads Sufficient Facts to Support a Due Process Claim Against Defendants Riester and Williams in Their Individual Capacities.**

The Fourteenth Amendment to the Constitution states: "No state shall . . . deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV § 1. In analyzing a procedural due process claim under § 1983, the court is to consider "first whether the plaintiff has been deprived of a protected interest in property or liberty, and if that is established, we consider whether the state's procedures comport with due process." *Rock River Health Care,*

---

[3] According to IU's website, Kathy Adams Riester's current title is Associate Vice Provost for Student Affairs and Executive Associate Dean of Students. As such, Plaintiff believes she is a properly named Defendant for purposes of Plaintiff's § 1983 action. *See Doe v. DiStefano*, 2019 WL 2372685, at *1 (D. Colo. June 5, 2019) (university chancellor was proper defendant for § 1983 claim where plaintiff sought expungement of disciplinary records); *see also Doe v. Citadel*, 2022 WL 2806473, at *4 (D.S.C. July 18, 2022) (university president, Title IX Coordinator, and director of sexual assault resource center were proper defendants for § 1983 action to expunge sexual misconduct disciplinary records and not entitled to Eleventh Amendment immunity). However, in the event the court determines that Defendant Riester is not the properly named individual for purposes of effecting the relief sought, Plaintiff respectfully requests leave to amend his complaint, to name the appropriate official.

*LLC v. Eagleson,* 14 F.4th 768, 773 (7th Cir. 2021).[4] The question of precisely how much process is due in a given scenario is a flexible inquiry dependent on the factual circumstances; however, the essentials are (i) adequate notice and (ii) a meaningful opportunity to be heard. *Goss v. Lopez*, 419 U.S. 565, 579 (1975).

For notice to be constitutionally adequate, it must "be of such nature as [to] reasonably convey the required information" and "afford a reasonable time" for a response/defense. *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). Regarding the opportunity to be heard, the opportunity must be provided "at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). Being heard in a "meaningful manner" requires, at a minimum, a "neutral and detached" decision-maker. *Concrete Pipe & Products of California, Inc. v. Constr. Laborers Pension Tr. for S. California*, 508 U.S. 602, 617 (1993).

A.   <u>*Plaintiff Adequately Pleads a Constitutionally Protected Property Interest*</u>

Plaintiff's Complaint plausibly alleges a § 1983 due process claim. First, Plaintiff alleges a protected property interest in his continued education. As explained by the Seventh Circuit:

> [G]iven that the "basic legal relation between a student and a private university or college is contractual in nature," a student may establish that an implied contract existed between himself and the university that entitled the student to a specific right, such as the right to a continuing education or the right not to be suspended without good cause. *Ross v. Creighton Univ.,* 957 F.2d 410, 416 (7th Cir.1992) (citation and quotation omitted). The "catalogues, bulletins, circulars, and regulations of the institution made available to the matriculant may become a part of the contract." *Id.* A right established by an implied contract between a student and a university can be a property interest subject to constitutional protection, *id.,* but to receive such protection, the student must first show that the implied contract establishes an entitlement to a tangible continuing benefit, s*ee Bd. of Regents of State Colleges v. Roth,* 408 U.S. 564, 574, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). In order to establish this type of entitlement, the student must "point to an identifiable contractual promise that the [university] failed to honor." *Id.; Gordon v. Purdue Univ.,* 862 N.E.2d 1244, 1248 (Ind.App.Ct.2007).

---

[4] While Plaintiff must ultimately prove these elements to prevail on the merits, on a Rule 12(b)(6) motion, Plaintiff need only plausibly allege these elements to avoid dismissal.

*Bissessur v. Indiana Univ. Bd. of Trustees,* 581 F.3d 599, 601–02 (7th Cir. 2009)

Contrary to Defendant's argument, Plaintiff does not merely allege that the University "conferred on him certain procedural rights and that the University failed to follow those procedures." (Defendant's Moving Brief, p. 10). Unlike the plaintiffs in *Bissessur v. Indiana Univ. Bd. of Trustees,* (581 F.3d 599, 603 (7th Cir. 2009)) and *Charleston v. Bd. of Trustees of Univ. of Illinois at Chicago,* (741 F.3d 769, 773 (7th Cir. 2013), here, Plaintiff's Complaint provides sufficiently detailed information concerning the contract that he entered into with the University. Plaintiff describes that his constitutionally protected property interest in his continued enrollment at IU, and freedom from arbitrary expulsion, arises from the policies, courses of conduct, practices and understandings established by the University, including the Policy on Discrimination, Harassment and Sexual Misconduct. Cmplt. ¶¶ 230-233. Plaintiff also describes the promises made by the University through the contract, which included but were not limited to: (1) the right to be fully informed of university policies and procedures as well as the nature of the alleged violations; (2) the right to be treated with respect, the right to "adequate, reliable, and impartial investigation and appropriate resolution of all complaints of discrimination, harassment and/or sexual misconduct"; (3) the right to a fair and impartial disciplinary process; (4) utilization of the preponderance of the evidence standard; and (5) the right to appeal. Cmplt. ¶¶ 234-241. Plaintiff identifies the promise he made in return as consideration for the contract: payment of associated fees and expenses to the University. Cmplt. ¶ 232. Further, Plaintiff delineates the precise provisions that were breached by the University, including: (1) a failure to notify Doe of the policies applicable to his case; (2) failure to appoint impartial decision-makers; (3) depriving Doe of an opportunity to cross-examine his accuser; (4) overlooking clear evidence disputing Roe's

credibility; and (5) imposing an excessively severe sanction upon Doe while failing to impose any sanction on Roe despite her violations of the University's policies. Cmplt. ¶¶ 242, 245.

Plaintiff has pointed to identifiable contractual promises that he relied upon, as a student of the University (which Plaintiff contends the University failed to honor), thus establishing a property interest subject to constitutional protection. At this procedural stage, Plaintiff has sufficiently described his property interest. *See Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 2709, 33 L. Ed. 2d 548 (1972) ("To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined.")

B.      *Plaintiff Adequately Pleads a Constitutionally Protected Liberty Interest*

Plaintiff likewise plausibly alleges that he has a protected liberty interest in his good name, reputation, honor, and integrity, which Defendants deprived him of without adequate process. To demonstrate a constitutionally protected liberty interest, Plaintiff "must satisfy the 'stigma plus' test, which requires him to show that the state inflicted reputational damage accompanied by an alteration in legal status that deprived him of a right he previously held." *Doe v. Purdue Univ.,* 928 F.3d 652, 661 (7th Cir. 2019). Specifically, to establish a liberty interest under the "stigma-plus test," a plaintiff "must show (1) that the state disclosed false information that damaged his reputation, (2) that the reputational harm made it "virtually impossible" for him to find employment in his chosen profession, and (3) that his legal status was altered, depriving him of a previously held right." *Doe v. Trustees of Indiana Univ.,* No. 120CV00123JRSDML,

2021 WL 2213257, at *2 (S.D. Ind. May 4, 2021), *appeal dismissed,* No. 21-2018, 2021 WL 5917581 (7th Cir. Sept. 7, 2021).

In his Complaint, Plaintiff makes clear that the sexual assault allegations brought by Jane Roe were false, leading to an erroneous finding of responsibility and the unwarranted sanction of expulsion. Cmplt. ¶¶ 3, 187, 198. Defendants do not dispute that Plaintiff's expulsion from IU constituted an alteration in legal status; he went from being a student in good standing to a student expelled from the University. Instead, Defendants argue that Plaintiff has not met the "stigma plus test" because neither Riester nor Williams themselves publicly disclosed any defamatory statement about Doe. However, in *Sciolino v. City of Newport News, Va.,* 480 F.3d 642 (4th Cir. 2007), the court held that the stigma portion of a stigma-plus claim may be satisfied upon alleging a "*likelihood*" of public disclosure, even if the disclosure hasn't occurred yet. *Id.* at 650 (emphasis added). Plaintiff meets that test here, as he will inevitably be required to authorize IU's disclosure of the disciplinary expulsion to third-party inquirers, including other institutions, graduate schools, and employers. Cmplt. ¶¶ 188, 225. This likely disclosure is sufficient to satisfy the stigma portion of the analysis. *See Brandt v. Bd. of Co-op. Educ. Servs., Third Supervisory Dist., Suffolk Cnty., N.Y.,* 820 F.2d 41, 45 (2d Cir. 1987) ("Courts of appeals for other circuits have similarly concluded that the public disclosure requirement has been satisfied where the stigmatizing charges are placed in the discharged employee's personnel file and are likely to be disclosed to prospective employers.") *citing to Doe v. United States Dep't of Justice,* 753 F.2d 1092, 1113 n. 24 (D.C.Cir.1985); *Burris v. Willis Indep. School Dist., Inc.,* 713 F.2d 1087, 1092 (5th Cir.1983); *Hogue v. Clinton,* 791 F.2d 1318, 1322 n. 7 (8th Cir.), cert. denied, 479 U.S. 1008, 107 S.Ct. 648, 95 L.Ed.2d 704 (1986); *Bailey v. Kirk,* 777 F.2d 567, 580 n. 18 (10th Cir.1985); *see also Larry v. Lawler,* 605 F.2d 954, 958 (7th Cir.1978).

C.     *Plaintiff Plausibly Alleges that Defendants Deprived Him of the Requisite Due Process in the Investigation and Adjudication of the Charges against Him.*

In addition to sufficiently alleging constitutionally protected interests, and deprivation therefrom by state actors, Plaintiff also plausibly alleges that the procedures employed by Defendants in their investigation and adjudication of the charges against him were deficient.

First, as mentioned *supra*, the extent of the process that must be provided under the Fourteenth Amendment is a flexible, fact-dependent standard. *Goss v. Lopez*, 419 U.S. 565, 579 (1975). In making this assessment, courts weigh: (i) "the private interest that will be affected by the official action"; (ii) "the risk of an erroneous deprivation . . . and the probable value, if any, of additional or substitute procedural safeguards"; and (iii) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. at 335. With respect to the first factor, student-plaintiffs have "a strong interest in completing [their] education and avoiding mistaken expulsion from the[ir] University." *Messeri v. DiStefano*, 480 F. Supp. 3d 1157, 1164 (D. Colo. 2020); *Goss v. Lopez*, 419 U.S. at 565, 579 (1975) ("The student's interest is to avoid unfair or mistaken exclusion from the educational process, with all of its unfortunate consequences."). With respect to the second factor, the Supreme Court has held that "[t]he risk of error is not at all trivial, and it should be guarded against if that may be done without prohibitive cost or interference with the educational process." *Goss*, 419 U.S. at 580.[5] Finally, while schools generally possess an interest in maintaining order, courts regularly find that a school's disciplinary decisions are not subject to the same level of deference as a school's *academic* determinations, as

---

[5] The Court in *Goss* was addressing the minimum requisite procedures for a 10-day suspension; it expressly acknowledged that "[l]onger suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures." *Goss*, 419 U.S. at 584.

only the latter are within the special purview of their educational expertise. *See Board of Curators v. Horowitz*, 435 U.S. 78, 86 (1978).

As set forth in further detail below, Plaintiff adequately alleges that he was denied due process. Plaintiff was expelled from the University without being afforded the minimal requirements of (1) adequate notice of the charges against him, when he was not notified of the specific policies applicable to his case, and (2) a meaningful opportunity to be heard when the University: (a) failed to appoint a neutral arbiter, (b) deprived Doe of an opportunity to cross-examine his accuser, and (c) overlooked the clear evidence disputing Roe's credibility. Furthermore, the University imposed an excessively severe sanction upon Doe while failing to impose any sanction on Roe. Cmplt. ¶¶ 242, 245. *See Goss v. Lopez*, 419 U.S. 565, 579 (1975).

i. *Defendants Failed to Provide Adequate Notice*

For notice to be constitutionally adequate, it must "be of such nature as [to] reasonably convey the required information" and "afford a reasonable time" for a response/defense. *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). Plaintiff describes in his Complaint how he was deprived of adequate notice, in violation of due process. Specifically, because the alleged events between Plaintiff and Jane Roe did not occur as part of a university program or activity, the complaints could not proceed under the University's Title IX Complaint Resolution Procedures. Cmplt. ¶ 139. While the Policy provided that the parties would be notified if a complaint did not meet the criteria for the Title IX Complaint Resolution Procedures, Doe never received such notice. Cmplt. ¶¶ 139-140. Instead, IU's Office of Student Conduct evidently chose to pursue the complaint against Plaintiff under a different set of resolution procedures, one that they failed to notify Doe of. In fact, the Office of Student Conduct never provided Plaintiff with any information regarding the procedures that were used in his case. Cmplt. ¶ 140. When Doe

19

questioned which procedures were being applied in his case, IU failed to provide any clarity, stating "it's complicated." Cmplt. ¶ 142. This failure to notify Doe of the precise procedures that were being utilized to determine whether he violated the University's policies on sexual misconduct was a violation of his procedural due process.

ii. *Defendants Deprived Plaintiff of a Meaningful Opportunity to be Heard*

Regarding the opportunity to be heard, the opportunity must be provided "at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). As the Supreme Court has made clear, the "opportunity to be heard" for due process purposes requires "a neutral and detached" decision-maker. *Concrete Pipe & Products of California, Inc. v. Constr. Laborers Pension Tr. for S. California*, 508 U.S. 602, 617 (1993). Plaintiff adequately alleges that he was deprived of an opportunity to be heard because: (i) the hearing panel members accepted Roe's allegations at face value; (Cmplt. ¶ 245); (ii) the hearing panel ignored clear evidence tending to dispute Roe's credibility including her continuously evolving narrative, witness statements confirming Doe's level of incapacitation, Roe's failure to provide copies of her SANE examination records, and evidence establishing that Roe initiated the sexual activity with Doe (*Id.*); (iii) Defendant Williams, as Chairperson of the hearing, carried out a proceeding in which Doe was treated as the perpetrator while Roe was treated as the victim (Cmplt. ¶ 250); (iv) the hearing panel members frequently addressed Doe in a critical and disparaging manner (Cmplt. ¶ 156); (v) the hearing panel asked Roe very few questions in comparison to Doe (Cmplt. ¶ 157); (vi) the hearing panel failed to ask Roe why she declined to disclose the results of her SANE examination during the investigation, even though she cited to medical records as corroborating evidence (Cmplt. ¶ 158); (vii) the hearing panel failed to contact Detective Scott or Prosecutor Jones to serve as witnesses during the hearing, even though they had taken Roe's initial statement regarding her

encounter with Plaintiff, and their testimony would have raised doubt regarding the veracity of her claims (Cmplt. ¶ 159); and (viii) Doe was deprived of an opportunity to cross-examine his accuser at the hearing, given the University chose to employ a policy that did not allow for such examination. Cmplt. ¶¶ 146, 245.

In light of the foregoing, Plaintiff plausibly alleges that he was deprived of constitutionally protected property and liberty interests, and sufficiently demonstrates how the University's procedures in investigating and adjudicating the charges against him failed to comport with the requisite due process.

### **Conclusion**

Based on the foregoing, Defendants' motion to dismiss Plaintiff John Doe's procedural due process claim, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) should be denied in its entirety.

Dated:  New York, New York
       June 29, 2023

*Attorneys for Plaintiff John Doe*

NESENOFF & MILTENBERG, LLP

By: */s/ Andrew T. Miltenberg*
Andrew T. Miltenberg, Esq. (*pro hac vice*)
363 Seventh Avenue, Fifth Floor
New York, New York 10001
amiltenberg@nmllplaw.com
(212) 736-4500

Tara J. Davis, Esq. (*pro hac vice*)
101 Federal Street, 19th Floor
Boston, Massachusetts 02110
tdavis@nmllplaw.com
(617) 209-2188

DELK MCNALLY

By: /s/ *Michael McNally*
Michael T. McNally
610 N. Rangeline Rd.
Carmel, IN 46033
(317) 442-4444
mcnally@delkmcnally.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 29th day of June, 2023, a true and exact copy of the foregoing was filed electronically via the Court's Electronic filing system. Notice of this filing was sent to the following persons by operation of the Court's Electronic filing system.

Amy Steketee Fox
CHURCH CHURCH HITTLE & ANTRIM
203 West Wayne Street, Suite 402
Fort Wayne, IN 46802
afox@cchalaw.com

Cassie Nichole Heeke
CHURCH CHURCH HITTLE & ANTRIM
Two North Ninth Street
Noblesville, IN 46060
cheeke@cchalaw.com

Liberty L. Roberts
CHURCH CHURCH HITTLE & ANTRIM
Two North Ninth Street
Noblesville, IN 46060
lroberts@cchalaw.com

*Attorneys for Defendants*

*Tara J. Davis*
Tara J. Davis